FILED
United States Court of Appeals
Tenth Circuit

September 6, 2012

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

     Plaintiff-Appellee,

v.

JONATHAN PABLO,

     Defendant-Appellant.

No. 09-2091

---

**On Remand from the
United States Supreme Court
(D.C. No. 1:06-CR-00759-MCA-2)**

---

Mark T. Baker, Long, Pound & Komer, P.A., Santa Fe, New Mexico, for Defendant-Appellee.

Gregory J. Fouratt, United States Attorney, and Laura Fashing, Assistant United States Attorney, Albuquerque, New Mexico, for Plaintiff-Appellant.

---

Before **BRISCOE,** Chief Circuit Judge, **EBEL,** and **HOLMES,** Circuit Judges.

---

**EBEL**, Circuit Judge.

---

     This appeal is back before us after our prior opinion in this case, United States v. Pablo, 625 F.3d 1285 (10th Cir. 2010), was vacated by the Supreme Court on June 29, 2012. The Supreme Court granted defendant-appellant Jonathan Pablo's petition for writ

of certiorari; vacated our 2010 judgment; and remanded the case to us "for further consideration in light of Williams v. Illinois, 567 U.S. ___ (2012)", a decision in which the Supreme Court addressed an issue similar to one of the issues presented in this case, concerning the Confrontation Clause of the Sixth Amendment.

Having reconsidered this appeal in light of Williams,[1] we again AFFIRM, although our analysis is somewhat altered. Namely, in this new opinion, we leave our prior opinion largely intact, but we make certain necessary revisions and additions to the discussion pertaining to the Confrontation Clause.[2]

\* \* \* \* \*

This appeal arises out of Jonathan Pablo's conviction by a jury for vaginal rape, kidnapping, assault resulting in serious bodily injury, and carjacking. Pablo was tried with a codefendant, Isaac Gordo ("Isaac"[3]), whom the jury convicted on similar counts. Here, we are faced only with Pablo's appeal, and he raises three challenges to his convictions: (1) that the district court deprived him of his confrontation rights under the

---

[1] We have also considered the Supreme Court's decision in Bullcoming v. New Mexico, 131 S.Ct. 2705 (2011), which was pending on certiorari when we issued our previous opinion. In our earlier opinion, we declined to stay this appeal until Bullcoming was decided because we did not believe the answer to the question on which the Supreme Court had granted certiorari in Bullcoming would be dispositive of the questions before us. See Pablo, 625 F.3d at 1295 n.10. We address Bullcoming below, in our new opinion, although Bullcoming is less relevant to this case than is Williams.

[2] We issue this new opinion without additional briefing or oral argument from the parties, having determined that additional argument would not materially assist our resolution of this appeal.

[3] Hereinafter we refer to Isaac Gordo as Isaac, for the sake of clarity, since there are other Gordos referenced in this opinion.

Sixth Amendment by admitting testimony of a DNA expert, Kortney Snider, when that expert relied on reports prepared by analysts not called to testify and conveyed the contents of those reports to the jury; (2) that the prosecutor and district court impermissibly interfered with his right to present a defense by raising the specter of self-incrimination to dissuade two defense witnesses, Zachary and Alzado Gordo, from testifying; and (3) that the district court erred by excluding certain evidence under Federal Rule of Evidence 412. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and, for the reasons that follow, we AFFIRM.[4]

## BACKGROUND

The events that led to the rape charges against Isaac and Pablo began on the night of January 29, 2005, and extended into the morning of January 30.[5] We start our recitation of the facts by noting that throughout the course of the following events, all parties involved drank at least some alcohol, but the defendants consumed particularly large quantities.

The rape victim, L.R.H., who was sixteen at the time, and the defendants first encountered each other at a local dance in Nageezi, New Mexico. L.R.H. attended the dance accompanied by her boyfriend, Dave Keetso, and his cousin. The defendants

---

[4] Because the crimes occurred on an Indian reservation and the defendants were Indians, the district court had jurisdiction under 18 U.S.C. § 3231 and 18 U.S.C. § 1153.

[5] Although there was conflicting testimony regarding the facts underlying the charges against Pablo and his co-defendant, we recite the following facts in the light most favorable to the jury's verdict. See Untied States v. Carnegie, 533 F.3d 1231, 1234 (10th Cir. 2008).

3

separately attended this dance and hung out with Isaac's cousins, Zachary and Alzado Gordo. Although Isaac testified that L.R.H. spoke to him at the dance and Dave Keetso testified that he encountered the defendants at the dance, little interaction occurred between these two groups until after the dance ended.[6]

Snow fell on the night of the dance, and by the end of the dance, the roads had become snow-covered. When Dave left the dance, he drove his cousin's Chevy Cavalier with his cousin in the passenger seat and L.R.H. sitting in the back seat, but Dave stopped multiple times so his cousin could go to the bathroom. Upon stopping just before a local convenience store, Isaac, Pablo, Alzado Gordo, and Zachary Gordo pulled up in Isaac's Ford Focus. After the parties conversed for a brief period, both groups drove up the road where everyone except Dave Keetso and L.R.H., who had fallen asleep in the back of the Cavalier, consumed more alcohol. Thirty minutes later, the groups continued down the road until Isaac's Ford Focus became badly stuck in the mud and snow.

When Isaac's car became stuck, Dave Keetso agreed to drive his cousin's Cavalier to pick up his own truck to pull the Focus out. Dave, his cousin, L.R.H., and Isaac drove together to pick up the truck and chains.[7] When they arrived at the truck, L.R.H. woke up

---

[6] Jonathan Pablo attempted to introduce evidence that witnesses observed L.R.H. at the dance in a state of partial undress in the presence of two other men, but the district court excluded that evidence under Federal Rule of Evidence 412. Pablo challenges that ruling on appeal.

[7] Pablo also complains on appeal about the district court's decision to exclude under Federal Rule of Evidence 412 Isaac's testimony that L.R.H. made sexual advances towards Pablo while in the backseat of the Cavalier, though, as we discuss later, precisely when these alleged advances occurred is unclear.

4

and climbed into Dave's truck, as did Isaac. Dave's cousin drove his Cavalier back alone. After some delay, they returned to where the Ford Focus had become stuck, hooked up the chains, and pulled it out.

Once Dave pulled Isaac's car out of the ditch, Isaac asked Dave to follow him in his truck on the dirt road at least until where the pavement began again.[8] Presumably, Isaac was accompanied in his Ford Focus by Pablo and his cousins, Zachary and Alzado Gordo. Dave began to follow Isaac to the paved road but Isaac stopped about a mile before where the pavement begins and signaled for Dave to stop as well, which he did. While they were stopped, Dave exited his car to unlock his four wheel drive. At this point, Isaac approached Dave from behind and began choking him before hitting him with a shovel. Although Dave Keetso also testified that Pablo attacked him and hit him with a shovel, the jury convicted him only of assault resulting in serious bodily injury; it acquitted him on the charge of assault with a dangerous weapon for his alleged use of a shovel in the altercation.

As Dave Keetso remained on the ground recovering from the defendants' beating, the defendants jumped into Dave's truck and drove away, with L.R.H. still asleep in it. L.R.H., who had fallen back asleep, awoke to find herself stuck between Isaac and Pablo, which left her "in shock and just frightened." (Supp. R. vol. 3 at 425:21-22.) Although L.R.H. attempted to climb out of the truck, Pablo prevented her from doing so. Isaac then drove farther down the road before stopping to go to the bathroom along the road.

---

[8] The testimony is not clear as to what happened to Dave's cousin at this point, though it appears he drove away separately.

5

L.R.H. again attempted to escape by driving away as Isaac and Pablo went to the bathroom, but Isaac foiled her efforts.

Eventually Isaac got the car stuck in a deep ditch a bit farther down the road. L.R.H's testimony indicated that a gray car matching the description of Isaac's Ford Focus was present for at least some time when Isaac got the truck stuck, and if it were Isaac's Ford Focus, it was likely driven by Isaac's cousins Alzado and Zachary Gordo. Isaac and Pablo left the truck for a brief period, and L.R.H. again attempted to drive away with no success. Isaac then returned to the truck, got in, said, "Hey, baby," violently pulled down L.R.H.'s pants, mounted her, and forcefully penetrated her vagina with his penis. (Id. at 429-31.) Afterwards, Isaac left the truck, and Pablo climbed in. He said, "Come on, baby," put on a condom, mounted her and penetrated her vagina despite her efforts to resist. (Id. at 431-32.) L.R.H. also testified that Pablo forced her to perform oral sex, but the jury acquitted Pablo on this charge.

Based on these events, Isaac and Pablo were both charged with vaginally raping L.R.H., kidnapping L.R.H., assaulting Dave Keetso with a dangerous weapon, assaulting Dave Keetso such that serious bodily injury resulted, and carjacking. Pablo was also charged with sexual assault for allegedly forcing L.R.H. to perform oral sex on him. The jury convicted Isaac on all counts. It convicted Pablo on all counts except, as noted, on the charges of assault with a deadly weapon and sexual assault via forced oral sex. Pablo was sentenced to a term of 200 months' imprisonment for the sexual assault, kidnapping, and carjacking convictions to run concurrently with a term of 120 months' imprisonment for the assault conviction. Pablo now appeals his convictions.

6

I. **Confrontation Clause**

As part of the state crime lab's analysis of the evidence in this case, lab analyst Kristin Dick prepared a DNA report and lab analyst Benita Boyd prepared a serology report. Originally, the government intended to call Ms. Dick and Ms. Boyd to testify against Pablo; however, they ultimately called only Kortney Snider, another lab analyst, to testify as an expert witness regarding the DNA analysis and serology analysis performed by the crime lab.[9] Ms. Snider's testimony conveyed to the jury that the DNA analysis connected Pablo to DNA found on L.R.H.'s genitalia as well as to a condom found at the scene of the rape.

On appeal, Pablo argues that Ms. Snider's testimony violated his confrontation rights. Pablo points out that Crawford v. Washington, 541 U.S. 36 (2004), restricts the admissibility of out-of-court testimonial statements against a defendant. Under Crawford, out-of-court testimonial statements may be admitted against a defendant only if either the declarant of those statements testifies at trial or the declarant is now unavailable to testify and the defendant had a prior opportunity to cross-examine the declarant. Id. at 54. In this case, Pablo argues that under the Supreme Court's decision in Melendez-Diaz v. Massachusetts, 129 S. Ct. 2527, 2532 (2009), which held that a forensic analyst's statements in an affidavit that drugs connected to a defendant were

---

[9] Ms. Dick ultimately could not testify because she became seriously ill while pregnant. The record is unclear as to why Ms. Boyd did not testify. Ms. Snider had no role in preparing Ms. Dick's report or Ms. Boyd's report.

cocaine constituted out-of-court testimonial statements, Ms. Dick's DNA report and Ms. Boyd's serology report also necessarily contained out-of-court testimonial statements. He further argues that the government introduced these out-of-court testimonial statements against him through Ms. Snider's testimony, which he claims simply parroted Ms. Dick's and Ms. Boyd's reports. Pablo points out that neither Ms. Dick nor Ms. Boyd were called to testify against him and, even assuming they were unavailable to testify, he never had a prior opportunity to cross-examine these declarants. Therefore, according to Pablo, Ms. Snider's testimony deprived him of his constitutional right to cross-examine Ms. Dick and Ms. Boyd.

The government counters that Ms. Snider testified as an expert and simply based her opinions on Ms. Dick's and Ms. Boyd's reports. It argues that Federal Rule of Evidence 703 permits this type of testimony, and, at least prior to Melendez-Diaz, we have allowed experts to rely on the notes of other lab technicians. See United States v. Davis, 40 F.3d 1069, 1075 (10th Cir. 1994). The government argues that this is precisely what Ms. Snider did, and Melendez-Diaz has not changed our law to prohibit an expert from relying on another's notes.

For the reasons that follow, we find no reversible error.

## A. Standard of Review

Pablo concedes that he neglected to raise his Confrontation Clause objection in the district court. Therefore, we review Pablo's claim for plain error. United States v. James, 257 F.3d 1173, 1182 (10th Cir. 2001). Under plain error review, we will notice the alleged error and grant the appellant relief only when four requirements are met: (1)

an error occurred; (2) the error is plain or obvious; (3) the error affects substantial rights; and (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. See id. We apply these requirements "less rigidly when reviewing a potential constitutional error." Id.

## B. Analysis

The Confrontation Clause restricts the admission of testimonial statements against a defendant. A testimonial statement is a statement that a reasonable person in the position of the declarant would objectively foresee might be used in the investigation or prosecution of a crime. See United States v. Pursley, 577 F.3d 1204, 1223 (10th Cir. 2009), cert. denied, 130 S. Ct. 1098 (2010). A district court may not admit out-of-court testimonial statements against a defendant if the declarant does not testify, unless the declarant is unavailable to testify and the defendant has had a prior opportunity to cross-examine the witness. See Williams v. Illinois, 132 S.Ct. 2221, 2232 (2012); Bullcoming, 131 S.Ct. at 2713; Melendez-Diaz, 129 S. Ct. at 2531; Crawford, 541 U.S. at 54.

A defendant's confrontation rights are implicated by the admission of testimonial statements against the defendant, however, only when they are admitted to establish the truth of the matter asserted in the statement. See Crawford, 541 U.S. at 60 n.9 (explaining that the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted"); accord Williams, 132 S.Ct. at 2235 (plurality op. of Alito, J.); id. at 2256 (Thomas, J., concurring in the judgment) (endorsing that rule stated in Crawford, but determining that the testimonial statements in the case at hand had been offered for the truth of the matter asserted); id. at

9

2268 (dissenting op. of Kagan, J.) (same). A prime example of where an out-of-court statement might be admitted for a purpose other than to establish its substantive truth, and one pertinent to this case, is when an expert witness testifies regarding the out-of-court development of facts or data on which the expert's opinions were based. Federal Rule of Evidence 703 authorizes an expert to testify to an opinion even if that opinion is based on otherwise inadmissible facts or data, which at times may include out-of-court testimonial statements. See Williams, 132 S.Ct. at 2233-35, 2239-40 (plurality op.). Although an expert often will not disclose this otherwise inadmissible information to a jury, Rule 703 permits disclosure to the jury if "the court determines that [its] probative value in assisting the jury to evaluate the expert's opinion substantially outweighs [its] prejudicial effect." Fed. R. Evid. 703. However, the disclosure of this otherwise inadmissible information is to assist the jury in evaluating the expert's opinion, not to prove the substantive truth of the otherwise inadmissible information. See Williams, 132 S.Ct. at 2233-35 (plurality op.); see also United States v. Farley, 992 F.2d 1122, 1125 (10th Cir. 1993) ("Rule 703 would allow the expert to testify regarding the information, even if the evidence would not otherwise be admissible."); Wilson v. Merrell Dow Pharm., Inc., 893 F.2d 1149, 1153 (10th Cir. 1990).

We have previously held that the extent to which an expert witness may disclose to a jury an otherwise inadmissible out-of-court statement without implicating a defendant's confrontation rights is a question of degree. See Johnson, 587 F.3d at 635 ("[A]n expert's use of testimonial hearsay is a matter of degree."). If an expert simply parrots another individual's out-of-court statement, rather than conveying an independent

judgment that only incidentally discloses the statement to assist the jury in evaluating the expert's opinion, then the expert is, in effect, disclosing that out-of-court statement for its substantive truth; the expert thereby becomes little more than a backdoor conduit for an otherwise inadmissible statement. See, e.g., id. ("Allowing a witness simply to parrot out-of-court testimonial statements of cooperating witnesses and confidential informants directly to the jury in the guise of expert opinion would provide an end run around Crawford." (quotations omitted)); United States v. Lombardozzi, 491 F.3d 61, 72 (2d Cir. 2007) (explaining that because an expert witness may "form an opinion by applying her expertise to otherwise inadmissible evidence," including out-of-court statements, and convey that information to the jury for purposes of evaluating the expert's opinion, the admission of the out-of-court statement deprives a defendant of his confrontation rights only if the expert conveys the statement "directly to the jury in the guise of an expert opinion"); cf. United States v. Affleck, 776 F.2d 1451, 1457-58 (10th Cir. 1985) (finding no error in a district court's admission of hearsay statements relied upon by an expert to form an opinion where the "expert's testimony was not simply a summarizing of the out-of-court statements of others" and "consisted primarily of his conclusions" based in part on hearsay).[10]

---

[10] The government cites United States v. Davis for the proposition that it is "'firmly established that an expert may testify from another person's notes.'" (Aple. Br. at 27 (quoting Davis, 40 F.3d at 1075).) Davis, however, was not suggesting that an expert could simply read the notes of another to the jury as if it were her expert opinion; rather, it was merely restating the well-established principle that an expert may rely on otherwise inadmissible facts or data as the basis of her opinion. See Davis, 40 F.3d at 1075; see also United States v. Posey, 647 F.2d 1048, 1051 (10th Cir. 1981) (explaining that Rule

11

Williams does not appear necessarily to conflict with the "parroting" precedent cited above,[11] but it may add further limitations on the admissibility of testimony regarding the results of lab reports in some cases. This is because in Williams, five members of the Supreme Court[12] concluded that the out-of-court statements in the report about which the witness testified were being offered for the truth of the matter asserted, even though the in-court witness perhaps was not merely "parroting" out-of-court statements in a DNA analysis produced by someone else; but the witness was implicitly assuming the accuracy of those statements in her discussion of DNA matches that could be made based on that the results of that analysis. See 132 S.Ct. at 2258 (Thomas, J., concurring) ("[The testifying witness] ultimately relied on [the] out-of-court statements that the [DNA] profile it reported was in fact derived from [the defendant]. Thus, the validity of [the witness's] opinion ultimately turned on the truth of the . . . statements [in the report]."); id. at 2268 (Kagan, J., dissenting) ("[F]ive Justices agree, in two opinions reciting the same reasons, that [the plurality's not-offered-for-the-truth] argument has no merit: [the witness's] statements about [the] report went to its truth . . . ."); id. at 2269 ("[A]dmission of the out-of-court statement in this context has no purpose separate from its truth; the factfinder can do nothing with it except assess its truth and so the credibility of the conclusion it serves to buttress."). Under Williams, whether a witness's testimony about a lab report produced by someone else must be considered offered for its truth may

703 makes it "quite reasonable for a chemist to review another chemist's analysis when forming an opinion as to the veracity of the latter's test results").

[11] Nor does Bullcoming. See 131 S.Ct. at 2013-17.

[12] Namely, Justice Thomas, concurring in the judgment, along with Justices Kagan, Scalia, Ginsburg, and Sotomayor, in dissent

turn on phrasing subtleties in the prosecutor's questions and the witness's responses. See id. at 2270 and n.2 (Kagan, J., dissenting).

However, as discussed below, given the facts of this case and the plain-error posture of our review, we need not decide the precise mandates and limits of Williams, to the extent they exist. In this case, Pablo argues that Ms. Snider simply parroted the out-of-court testimonial statements contained in Ms. Dick's DNA report and Ms. Boyd's serology report. Therefore, according to Pablo, the government introduced Ms. Dick's and Ms. Boyd's out-of-court statements for their substantive truth, but failed to provide Pablo an opportunity to cross-examine these declarants as required by the Confrontation Clause. Accordingly, he contends that the admission of Ms. Snider's testimony was plain error that affected his substantial rights.

We address Ms. Snider's testimony as it relates to Ms. Dick's and Ms. Boyd's reports separately. [13]

### 1. Testimony related to Ms. Dick's DNA report

Pablo first objects to the admission of Ms. Snider's testimony as it relates to Ms. Dick's DNA analysis and report, arguing that the Confrontation Clause requires that he have an opportunity to cross-examine Ms. Dick. We need not decide, however, whether

---

[13] Pablo also makes passing comments that Ms. Dick's supervisor who peer-reviewed Ms. Dick's DNA report was also not called to testify, but he fails to identify any out-of-court testimonial statements made by the supervisor that Ms. Snider conveyed to the jury. In his reply brief, he describes Ms. Dick and Ms. Boyd as having become witnesses against Pablo because of Ms. Snider's testimony, but he makes no such argument with respect to Ms. Dick's supervisor. Thus, Pablo has provided no basis for us to find a violation of his confrontation rights with respect to the government's decision not to call Ms. Dick's supervisor to testify.

the district court erred in this regard. Pablo cannot succeed on appeal because we find that this alleged error—the admission of Ms. Snider's testimony regarding Ms. Dick's DNA report—is not plain. Furthermore, as an independent reason to affirm, assuming arguendo that admitting Ms. Snider's testimony about the DNA report was plain error, Pablo has failed to show that error affected his substantial rights.

### (a) There was no plain error

For purposes of plain error review, the term "plain" requires that the error be clear or obvious under current law. See United States v. Olano, 507 U.S. 725, 734 (1993); see also Johnson v. United States, 520 U.S. 461, 467 (1997). Pablo argues that Ms. Snider's testimony parroted Ms. Dick's DNA report. Ms. Dick's DNA report, however, is not a part of the appellate record. The absence of that report prevents us from independently determining the extent to which, if any, Ms. Snider parroted Ms. Dick's DNA report. Conversely, we also cannot discern the extent to which, if any, Ms. Snider is testifying to her own opinion drawn from that report. Without Ms. Dick's DNA report, we are left to divine from Ms. Snider's testimony whether she was parroting Ms. Dick's report, but Ms. Snider's testimony on its own does not make it clear that Ms. Snider parroted Ms. Dick's DNA report. Thus, we cannot characterize Ms. Snider's testimony as a clear or obvious parroting of Ms. Dick's DNA report. See Skyes v. United States, 373 F.2d 607, 613 (5th Cir. 1966) (explaining that appellate courts are "not equipped for divination" and "[t]hat which is not visible cannot be 'plain.'"); see also United States v. Rose, 587 F.3d 695, 700-01 (5th Cir. 2009) (finding no plain error where supervising lab analyst relayed to the jury some out-of-court statement contained in a drug analysis report she did

14

not perform because there were factual ambiguities regarding the supervisor's role in, and personal knowledge of, the testing and report), <u>cert. denied</u>, 130 S. Ct. 1915 (2010).

Pablo attempts to counter the factual ambiguity in the record by emphasizing portions of Ms. Snider's testimony where she indicates that DNA analysts write their reports so that other analysts can read those reports and testify about them. For example, when asked whether she would "simply be testifying like reading somebody else's report," Ms. Snider responded in the affirmative, explaining that analysts are trained to write their "report or write [their] notes so somebody can . . . go to testify in court if [they] can't go." (Supp. R. vol. 3 at 177:2-10.) Pablo argues that this makes plain that Ms. Snider merely read Ms. Dick's DNA report to the jury. Pablo's interpretation of this testimony is reasonable. But Ms. Snider's testimony in this respect is susceptible to a different but still reasonable interpretation—namely, that analysts are trained to record their data and processes in a manner that allows other analysts to review the information in order to draw an independent judgment about the DNA analysis and to testify to that independent judgment drawn from others' reports. Nowhere does Ms. Snider testify that she is simply parroting Ms. Dick's DNA report to the jury. To the contrary, her testimony revealed her own extensive review of the entire test procedure in this case and she expressed her own expert conclusions. In the course of discussing her review of this record, she does once or twice discuss Ms. Dick's conclusions as well, but she apparently does so in the context of explaining some of the data and information she is relying on in giving her own expert opinion. Thus, Ms. Snider's testimony fails to make clear or

obvious the alleged factual basis for the asserted error and thus the admission of that testimony when no confrontation clause objection was raised below is not plain error.

In light of Williams, five Justices of the Supreme Court might find that Ms. Snider's testimony, on its face, was being offered for the truth of the out-of-court report of Ms. Dick—at least to the extent that Ms. Snider's testimony at least implicitly assumed that the findings or conclusions in Ms. Dick's report were in fact true. See Williams, 132 S.Ct. at 2256-59 (Thomas, J., concurring); id. at 2270 (Kagan, J., dissenting) (determining that a witness's testimony regarding a DNA report was offered for the truth of the matter asserted in the report, when the witness's testimony "affirmed, without qualification, that the . . . report showed a 'male DNA profile found in the semen from the vaginal swabs of [the victim].'" (quoting the trial transcript)).  Arguably that was the case with parts of Ms. Snider's testimony that were comparable to the challenged testimony in Williams, where the witness affirmed that "[t]here [was] a computer match generated of the male DNA profile found in semen from the vaginal swabs of [the victim] to a male DNA profile that had been identified as having originated from [the defendant]." Id. at 2236 (quotation marks omitted).  (See R. v.3 pt.1 at 281-285.[14]).

---

[14] For example, the cited portion of Ms. Snider's testimony included the following excerpts:

Q.    Were there any matches from the gynecological swabs. . . ?

        *       *       *

A.    Yes, we had DNA matches between the specific items that were taken from the sexual assault kit to buccal swabs that were collected from [Pablo].

        *       *       *

16

Nevertheless, we cannot say the district court plainly erred in admitting Ms. Snider's testimony, as it is not plain that a majority of the Supreme Court would have found reversible error with the challenged admission. On the contrary, it appears that five Justices would affirm the district court in this case, albeit with different Justices relying on different rationales as they did in Williams. The four-Justice plurality in Williams likely would determine that Ms. Snider's testimony was not offered for the truth of the matter asserted in Ms. Dick's report, but rather was offered for the separate purpose of evaluating Ms. Snider's credibility as an expert witness per Fed. R. Evid. 703; and therefore that the admission of her testimony did not offend the Confrontation Clause. See Williams, 132 S.Ct. at 2233-41 (plurality op. of Alito, J.). Meanwhile, although Justice Thomas likely would conclude that the testimony was being offered for the truth of the matter asserted, he likely would further determine that the testimony was nevertheless constitutionally admissible because the appellate record does not show that the report was certified, sworn to, or otherwise imbued with the requisite "solemnity"

---

A.     The DNA from the sperm fraction of the condom is a mixture of at least two individuals. This matches the DNA profile from Jonathan Pablo . . . .

*    *    *

Q.     Moving onto, I think, the external genital swab.
A.     . . . The external swab is mixture of at least two individuals. The major component of this mixture matches the DNA profile of Jonathan Pablo from all 14 LOCIs.

*    *    *

A.     . . . The DNA profile from the sperm fraction of the vaginal swab is mixture of at least two individuals. The major component of this mixture matches DNA profile from Jonathan Pablo at all 14 LOCIs.

17

required for the statements therein to be considered "'testimonial' for purposes of the Confrontation Clause." Id. at 2259-60 (Thomas, J., concurring). Since Ms. Dick's report is not a part of the appellate record, we naturally cannot say that it plainly would meet Justice Thomas's solemnity test. In sum, it is not clear or obvious under current law that the district court erred in admitting Ms. Snider's testimony, so reversal is unwarranted on this basis. See Olano, 507 U.S. at 734 (1993).

Nor do we think that Melendez-Diaz compels a finding of plain error in this case. Significantly, in Melendez-Diaz, the state trial court "admitted into evidence affidavits reporting the results of forensic analysis which showed that material seized by the police and connected to the defendant was cocaine." 129 S.Ct. at 2530. The Supreme Court concluded that, under Crawford v. Washington, the affidavits were testimonial statements of witnesses admitted against the defendant. Melendez-Diaz, 129 S.Ct. at 2532. In Melendez-Diaz, then, the affidavits disclosing the results of a forensic analysis were admitted into evidence. 129 S.Ct. at 2530. That is, the actual out-of-court statements were admitted into evidence against the defendant and the government failed to call the statements' declarant. In contrast, here, Ms. Dick's DNA report was never admitted into evidence.

We reach the same conclusion with respect to Bullcoming. The petitioner in Bullcoming was charged with driving while intoxicated. 131 S.Ct. at 2709.

> Principal evidence against [petitioner] was a forensic laboratory report
> certifying that [his] blood-alcohol concentration was well above the [legal]
> threshold . . . At trial, the prosecution did not call as a witness the analyst
> who signed the certification. Instead, the State called another analyst who

18

was familiar with the laboratory's testing procedures, but had neither participated in nor observed the test on [petitioner's] blood sample.

Id.  Also, as in Melendez-Diaz, the challenged lab report was actually admitted into evidence by the trial court.  Bullcoming, 131 S.Ct. at 2712 ("The trial court overruled [petitioner's Confrontation Clause] objection and admitted the . . . report as a business record." (citations omitted)).   The Supreme Court reversed petitioner's conviction in a 5-4 opinion.[15]  We distinguish Pablo's case from Bullcoming and determine that Bullcoming does not compel reversal on our review in this case for the same reason stated above with respect to Melendez-Diaz: namely, the challenged report was actually admitted into evidence in Bullcoming, but not in this case.  Primarily due to that important distinction, our review in the present case is more directly controlled by Williams than by either Bullcoming or Melendez-Diaz.  And as discussed above, under the more factually on-point decision in Williams, we cannot find plain error below.

We add that the manner in which, and degree to which, an expert may merely rely upon, and reference during her in-court expert testimony, the out-of-court testimonial conclusions in a lab report made by another person not called as a witness is a nuanced legal issue without clearly established bright line parameters, particularly in light of the

_____

[15] As part of its holding, the Court determined that the lab report admitted into evidence possessed the requisite formality to qualify as testimonial for Confrontation Clause purposes, relying chiefly on Melendez-Diaz.  See id. at 2016-17, see also id. at 2014-16 (rejecting the arguments that the certifying analyst was a mere scrivener of the testing machine's results, and that the ability to cross-examine the called witness—who, unlike the certifying analyst, could not testify to certain important points about the actual lab test that was done—satisfied the defendant's right to confrontation).

19

discordant 4-1-4 divide of opinions in Williams.[16] See Williams, 132 S.Ct. at 2245 (Breyer, J., concurring) ("I believe the question [raised in this case is] difficult, important, and not squarely addressed either today or in our earlier opinions . . . ."); id. at 2277 (Kagan, J., dissenting) ("[The] clear rule [of our Confrontation Clause precedent] is clear no longer. . . . What comes out of four Justices' desire to limit Melendez–Diaz and Bullcoming in whatever way possible, combined with one Justice's one-justice view of those holdings, is—to be frank—who knows what. . . . [N]o one can tell in what way or to what extent they are altered because no proposed limitation commands the support of a majority. . . . Today's plurality and concurring opinions [sow] uncertainty . . . .").

We conclude that the admission of Ms. Snider's testimony as it relates to Ms. Dick's DNA report did not constitute plain error.

### (b) Any plain error did not affect Pablo's substantial rights

Assuming arguendo the district court plainly erred in admitting Ms. Snider's testimony regarding Ms. Dick's DNA report, Pablo's argument for reversal on appeal still fails because Pablo has failed to show that such error affected his substantial rights. See James, 257 F.3d at 1182. Satisfying this third prong of plain-error review "usually means that the error must have affected the outcome of the district court's proceedings." United States v. Gonzalez-Huerta, 403 F.3d 727, 732-33 (10th Cir. 2005) (en banc) (quotation

---

[16] '4-1-4' refers, respectively, to the plurality opinion authored by Justice Alito, the concurring opinion of Justice Thomas, and the dissenting opinion authored by Justice Kagan. Justice Breyer, who joined the plurality opinion in full (and so counts as part of the first '4'), also wrote a separate concurrence to explain his view that additional briefing and re-argument were warranted in light of the Court's unsatisfactory (in his view) resolution of the question raised in Williams. See, 132 S.Ct. at 2244-45 (Breyer, J., concurring).

20

omitted).  "The appellant bears the burden to make this showing. . . . [He] must show a reasonable probability that, but for the error claimed, the result of the proceeding would have been different."  Id. at 733 (quotation omitted).

In this case, without the DNA evidence to establish that Pablo had vaginal sex with the victim, there remains the testimony of both the victim and Pablo's co-assailant, Isaac, who both testified that Pablo forcibly had vaginal sex with the victim.  Moreover, Pablo himself testified that he had vaginal sex with the victim, though he claimed it was consensual.[17]  We acknowledge that the jury could have discredited the testimony of the victim and of Isaac, but in light of the combination of their testimony along with Pablo's own admission, we determine that Pablo has not shown a reasonable probability that he would not have been convicted even without the introduction of Ms. Snider's testimony regarding Ms. Dick's DNA report.[18]

---

[17] The government also points out that Pablo apparently told a police officer that he had consensual sex with the victim.  This statement, however, was never introduced at trial.  Additionally, the government points out that the examining physician testified that the victim's injuries were consistent with forcible sex.  However, Isaac also raped the victim, so Pablo could have attributed the injuries to Isaac.

[18] Pablo claims he would not have testified at trial but for the introduction of the DNA analysis.  Although Pablo had planned to testify at the outset, he argues he needed to testify because, at the outset, he believed the DNA report would be admitted.  Because the DNA report so concretely showed he had sex with the victim, Pablo determined his best defense strategy was to testify, admitting he had sex with the victim but claiming it was consensual.  Pablo argues, however, that if the results of the DNA report were not introduced, he could have simply avoided testifying and simply discredited the victim and Isaac.  The government counters that, in any event, Pablo needed to testify to defend himself against the other charges against him.

We find the government's argument persuasive.  Moreover, on this record, we conclude that it is merely speculative that the jury would have reached a different verdict if Pablo had not testified.  At trial, Pablo admitted only to having consensual sex with the

## 2. Testimony related to Ms. Boyd's serology report

Pablo raises a similar objection to the admission of Ms. Snider's testimony as it relates to Ms. Boyd's serology report, arguing that the Confrontation Clause requires that he have an opportunity to cross-examine Ms. Boyd. Again, we decline to determine whether or not the district court erred because Pablo's alleged error is not plain, for substantially the same reasoning advanced with regard to Ms. Dick's report. Further, Pablo has failed to show the alleged error regarding Ms. Boyd's report affected his substantial rights.

As with Ms. Dick's DNA report, we have no clear factual basis for determining if Ms. Snider merely parroted the contents of Ms. Boyd's serology report because Ms. Boyd's report is not a part of the appellate record, and Ms. Snider's testimony on its own does not make it clear that she was merely parroting Ms. Boyd's serology report. See Rose, 587 F.3d at 700-01 (finding no plain error because of factual ambiguities in the record). We note that the appellate record contains at least some notes signed and stamped by Ms. Boyd, but these materials do not adequately resolve the factual ambiguity. The appellate record contains a district court exhibit, Exhibit AA, the first five pages of which are signed or stamped by Ms. Boyd and the last five pages of which appear to have been prepared by the medical professional that examined L.R.H. after the rape. The district court did not admit Exhibit AA to the jury; rather, it admitted it as a

victim. That admission—to a lawful explanation of the sexual encounter—was not so much more inculpating than his hypothetical silence would have been as to show a reasonable probability that he would not have been convicted in the hypothetical situation.

matter of record outside the presence of the jury because a dispute had arisen over whether the prosecution had timely disclosed Exhibit AA to the defendants, particularly the last five pages of the exhibit. And, after reviewing the record, it appears that the first five pages of Exhibit AA are simply Benita Boyd's notes, not the serology report about which Pablo complains. (See Supp. R. vol. 3 at 332:7-19 (referring to Ms. Boyd's report and Ms. Dick's report as having previously been disclosed to the defendant, but indicating that various notes had not been disclosed).) Moreover, neither Pablo's nor the government's briefs ever cite to Exhibit AA—Supp. R. vol. 1—as constituting Ms. Boyd's serology report. Thus, despite these notes in the record, we still have an inadequate factual basis from which to determine if Ms. Snider inappropriately parroted Ms. Boyd's serology report, and thus we cannot find plain error. And, to the extent Pablo argues that the parroting is self-evident from Ms. Snider's testimony, we disagree.

Also, we again conclude that it is not plain under the combination of views expressed in Williams that a majority of the Supreme Court would find error in admitting the challenged testimony, as discussed above.

For the foregoing reasons, Pablo's alleged error concerning Ms. Snider's testimony as it relates to Ms. Boyd's serology report is not a plain error that affected his substantial rights.

## II. Government Interference with Pablo's Witnesses

Pablo next asserts that the prosecution and district court impermissibly interfered with his right to present a defense by dissuading from testifying two defense witnesses— Zachary Gordo and Alzado Gordo. He argues that the prosecution raised the specter of

self-incrimination to coerce the witnesses not to testify favorably for Pablo, and the district court erred by refusing to require the witnesses to testify after each witness consulted with independent counsel and subsequently invoked their privilege against self-incrimination. We disagree.

## A. Standard of Review

We review de novo a defendant's claim that the prosecution and district court deprived the defendant of the defendant's constitutional right to present a defense by using undue influence to dissuade witnesses from testifying. See United States v. Solomon, 399 F.3d 1231, 1239 (10th Cir. 2005); see also United States v. Serrano, 406 F.3d 1208, 1214 (10th Cir. 2005).

## B. Analysis

An essential ingredient to a fair trial is the defendant's right to present a defense. Serrano, 406 F.3d at 1214. The Due Process Clause and the Compulsory Process Clause work together to ensure a defendant has "the right to present a defense by compelling the attendance, and presenting the testimony, of his own witnesses[.]" Id. at 1215. The right to due process "include[s] a right to be heard and to offer testimony." Id. (quotations omitted). And the right to compulsory process guarantees the defendant "the right to the government's assistance in compelling the attendance of favorable witnesses at trial and the right to put before a jury evidence that might influence the determination of guilt." Id. (quotations omitted).

A criminal defendant's right to present a defense, however, is not unfettered. Id. This right may, "in appropriate cases, bow to accommodate other legitimate interests in

24

the criminal trial process." Id. (quotation omitted). In this case, Pablo's right to present a defense ran up against the right of two witnesses to invoke their Fifth Amendment privilege against self-incrimination. And we have explained that "a defendant's right to present a defense does not include the right to compel a witness to waive his Fifth Amendment privilege against self incrimination." Id.

Although a witness may freely invoke his privilege against self incrimination even at the expense of the defendant's right to present a defense, "the government cannot substantially interfere with a defense witness's decision to testify." Id. This restriction on government action applies to both prosecutors and the district court. Id. at 1215-16. To determine if the government impermissibly interfered with a witness's decision to testify, we ask whether the government's interference was "substantial." Id. at 1216 (quotations omitted). "Interference is substantial when the government actor actively discourages a witness from testifying through threats of prosecution, intimidation, or coercive badgering." Id. (emphasis added). But "[t]he potential for unconstitutional coercion by a government actor significantly diminishes . . . if a defendant's witness elects not to testify after consulting an independent attorney." Id. By way of example, in Serrano, we found no substantial interference where the prosecution merely raised to the district court a legitimate concern about witnesses incriminating themselves if they testified and the district court simply expressed this concern to the witnesses and appointed independent counsel to advise them on that issue. Id. This case is on all fours with Serrano.

25

Here, the prosecution did not "actively discourage[]" Pablo's two witnesses "from testifying through threats of prosecution." See id. Instead, the prosecutor merely raised his concern to the district court that the testimony of these two witnesses could lead to their prosecution. The prosecutor felt that the likely presence of these two witnesses before, during, and after the rape gave rise to a risk of self-incrimination that required him to notify the district court. And the prosecutor did not misrepresent or otherwise overstate his concern but explained that he could not "promise the Court that, depending on what they said, the United States would not prosecute them." (R. vol. 3 pt. 1 at 328:10-12.) Nothing in the prosecutor's colloquy with the district court indicates active discouragement through the threat of prosecution.

To the extent Pablo is arguing that the prosecutor acted in bad faith by raising the self-incrimination issue, we find no support in the record for that argument. See Serrano, 406 F.3d at 1212 n.1 (citing United States v. Crawford, 707 F.2d 447, 450 (10th Cir. 1983), for the proposition that "an assistant United States attorney ha[s] an obligation to disclose the fact that several of the defense witnesses were targets of other investigations" and further citing United States v. Jackson, 935 F.2d 832, 847 (7th Cir. 1991), for the proposition that "'ethical duties require prosecutors to warn unrepresented witnesses of the risk that the testimony they are about to give may be used against them'"). L.R.H. testified that at around the time she was raped, a car matching the description of Isaac's gray Ford Focus was also present. Under the circumstances—namely, that Dave Keetso had been left behind incapacitated and Dave's cousin had likely left in his own car—we can infer that the car that appeared before the rape may have been Isaac's Ford Focus

26

driven by Zachary and Alzado Gordo. And since Pablo and Isaac left L.R.H. in the truck after the rape, we can further infer a possibility that they left the scene of the crime in the Ford Focus with Zachary and Alzado. Thus, these circumstances present a real risk that Zachary and Alzado may have incriminated themselves if they testified, and we cannot find the prosecutor raised that concern in bad faith.

The district court also responded appropriately to the self-incrimination concern raised by the prosecution. The district court engaged in a colloquy with each prospective witness. The district court did not go beyond informing the prospective witnesses of the privilege against self-incrimination, inquiring about whether they had conferred with counsel, and appointing independent counsel for each witness once it learned that neither had conferred with independent counsel regarding the implications of testifying. Nothing in the district court's colloquy with the prospective witnesses reflects any active discouragement of testimony by the district court.

In addition to the fact that the record reveals no signs of undue coercion by either the prosecutor or the district court, the fact that each prospective witness received the advice of independent counsel before invoking the privilege against self-incrimination "significantly diminishes" the risk that either the prosecutor or district court unconstitutionally coerced the prospective witnesses not to testify. See Serrano, 406 F.3d at 1216. The district court questioned the attorneys to ensure each believed his client's testimony could lead to self-incrimination, and both attorneys agreed that it could. Only then did the district court conclude that Pablo could not compel Zachary and Alzado

Gordo to testify because they had properly invoked their privilege against self-incrimination.

For the foregoing reasons, we conclude that neither the prosecutor nor the district court deprived Pablo of his constitutional right to present a defense because neither substantially interfered with Zachary and Alzado Gordo's decision to testify or not to testify; rather, as in Serrano, both prospective witnesses freely invoked the privilege against self-incrimination after conferring with independent counsel.[19]

## III.    Rule 412 Evidence

Pablo's final argument on appeal asserts that the district court committed reversible error by excluding two pieces of evidence under Federal Rule of Evidence 412: (1) that L.R.H. was seen undressed with two other men on the night of the rape; and (2) that L.R.H. made sexual advances towards Isaac—Pablo's co-defendant—on the night of the rape.  We conclude, however, that the district court did not commit reversible error.

A district court faces a difficult task when confronted with evidence that falls within the scope of Rule 412.  Rule 412 pits against each other two exceedingly important values—the need "to safeguard the alleged [sexual assault] victim against the invasion of privacy, potential embarrassment and sexual stereotyping that is associated with public disclosure of intimate sexual details,"  Fed. R. Evid. 412, cmt. n. 1994 amends., and the need to ensure that criminal defendants receive fair trials.  The tension

---

[19] We note additionally that Pablo made no formal proffer of how Zachary and Alzado Gordo would have testified if they had not invoked their Fifth Amendment Rights.  Thus, we have no basis in this record even to conclude that Pablo was prejudiced by their refusal to testify.

28

between these two values makes it particularly difficult to resolve Rule 412 issues, and we bear that in mind as we address the Rule 412 issues that arose in this case.

**A. Standard of Review**

We review a district court's determination regarding the admissibility of evidence under Rule 412 for an abuse of discretion. See United States v. Ramone, 218 F.3d 1229, 1234 (10th Cir. 2000). To the extent the challenge to the exclusion of evidence proffered by the defendant is based on a constitutional objection, however, we review the district court's ruling excluding that evidence de novo. See id.; see also United States v. Powell, 226 F.3d 1191, 1198 (10th Cir. 2000) ("[W]e review challenges to rulings excluding evidence proffered by the defense de novo where the objections are based on Sixth Amendment confrontation rights.") And to the extent the defendant neglected to raise in the district court an objection to the exclusion of evidence, we review under the plain error standard set forth above. See James, 257 F.3d at 1182.

**B. Analysis**

Federal Rule of Evidence 412 creates special restrictions on the admissibility of evidence of a victim's alleged past sexual behavior or alleged sexual predisposition. In criminal sexual misconduct cases, Rule 412 excludes this type of evidence unless any of three exceptions apply:

> **(a) Evidence generally inadmissible**.--The following evidence is not admissible in any civil or criminal proceeding involving alleged sexual misconduct except as provided in subdivisions (b) and (c):
>> **(1)** Evidence offered to prove that any alleged victim engaged in other sexual behavior.
>> **(2)** Evidence offered to prove any alleged victim's sexual predisposition.
> **(b) Exceptions**.--

29

**(1)** In a criminal case, the following evidence is admissible, if otherwise admissible under these rules:

>   **(A)** evidence of specific instances of sexual behavior by the alleged victim offered to prove that a person other than the accused was the source of semen, injury or other physical evidence;
>   **(B)** evidence of specific instances of sexual behavior by the alleged victim with respect to the person accused of the sexual misconduct offered by the accused to prove consent or by the prosecution; and
>   **(C)** evidence the exclusion of which would violate the constitutional rights of the defendant.

Fed. R. Evid. 412.  The parties in this case dispute whether Pablo's proffered evidence qualifies for any of the exceptions contained in Rule 412(b).[20]

### 1.  Evidence that L.R.H. was partially nude with two other men

---

[20] The government also asserts that we need not reach the merits of the district court's Rule 412 rulings because Pablo failed to comply with Rule 412's notice requirements. Rule 412(c) requires a party seeking to introduce evidence that falls within Rule 412's scope to "file a written motion at least 14 days before trial specifically describing the evidence and stating the purpose for which it is offered" and to "serve the motion on all parties and notify the alleged victim or, when appropriate, the alleged victim's guardian or representative."  A defendant's noncompliance with the requirements may be excused, however, if the district court finds "good cause."  Id.  Pablo indeed failed to file the required written motion giving notice within Rule 412(c)'s time constraints to all parties and to L.R.H.  And Pablo effectively concedes this point, though he dubiously suggests that the government relieved him of his obligation to comply with Rule 412(c) by providing its own written notice to the district court that Pablo might introduce some evidence that would fall within Rule 412's scope, though it did not specifically identify that evidence.  Pablo also argues, albeit without making his argument clear, that the district court implicitly made a "good cause" finding excusing his noncompliance because it acknowledged his noncompliance but nonetheless reached the merits of the Rule 412 issue.  However, even if we were to assume for the sake of argument either that the government's filing of a Rule 412(c) motion relieved Pablo of his obligation to comply with Rule 412(c) or that the district court made an adequate good cause finding that excused Pablo's noncompliance, we would reach the same result: Pablo is not entitled to relief for the district court's exclusion of evidence under Rule 412.  Thus, we need not resolve these procedural disputes.

In the district court, Pablo proffered that witnesses could testify that, at the dance that preceded the rape, they observed L.R.H. intoxicated and in state of partial undress in the presence of two other men. Pablo now argues for the first time that the district court erred in excluding this evidence under Rule 412 because it falls within Rule 412(b)(1)(A)'s exception to Rule 412(a).[21] Rule 412(b)(1)(A) permits a district court to admit "evidence of specific instances of sexual behavior by the alleged victim offered to prove that a person other than the accused was the source of semen, injury or other physical evidence." Pablo asserts that this evidence could prove that the two other men, not Pablo, were responsible for L.R.H.'s vaginal injuries consistent with a forcible rape. He also argues that the evidence would have shown L.R.H.'s state of intoxication and undermined the reliability of her testimony. Because Pablo concedes that he failed to raise this argument in the district court, we review his claim for plain error. We find no error, plain or otherwise.

---

[21] In his reply brief, Pablo includes a passing suggestion, unsupported by any argument, that this evidence was also admissible because Rule 412(b)(1)(C) applied. As Pablo neither adequately developed his argument with respect to Rule 412(b)(1)(C) nor properly raised this argument in his opening brief, we decline to address it. See United States v. Smith, 606 F.3d 1270, 1284 n.5 (10th Cir. 2010) (explaining that "issues raised by an appellant for the first time on appeal in a reply brief are generally deemed waived" (quotations omitted)); United States v. Hardwell, 80 F.3d 1471, 1492 (10th Cir. 1996) (explaining that a defendant waives an issue "by failing to make any argument or cite any authority to support his assertion").

Pablo's proffered evidence bears no adequate connection to L.R.H.'s vaginal injuries. The medical professional that examined L.R.H. after the rape testified that she had seen vaginal injuries like those suffered by L.R.H. only in cases of forced vaginal penetration, never in cases of consensual sex. She opined that such injuries would occur in cases of consensual sex, if ever, only in extreme cases of "pretty violent consensual sex." (Supp. R. vol. 3 at 402:18-24.) The evidence Pablo proffered, however, contains no implication that L.R.H. engaged in intercourse with these other two unidentified men nor that any such intercourse was not consensual or was otherwise extremely violent. At most, Pablo describes his proffered evidence as tending to show L.R.H. had engaged in "a <u>consensual</u> encounter" with these two men, and that would not explain the injuries that L.R.H. incurred. (Aplt. Br. at 38.) Thus, the district court did not abuse its discretion by excluding the evidence because this evidence bears, at best, only a speculative and tenuous relationship to Pablo's argument that these two men may have caused L.R.H.'s vaginal injuries.

To the extent Pablo further argues that his proffered evidence should have been permitted for the limited purpose of demonstrating L.R.H.'s alleged level of intoxication, we find this argument equally unavailing. Rule 412(a) prohibits the admission of "[e]vidence offered to prove [the] alleged victim engaged in other sexual behavior" or "[e]vidence offered to prove [the] alleged victim's sexual predisposition." And the district court had legitimate reasons to perceive that Pablo sought to introduce this evidence for these impermissible purposes, arguing apparently that her intoxication enhanced her predisposition toward casual sex. Thus, we cannot conclude the district

32

court abused its discretion by excluding the proffered evidence, particularly when the defendant had (and used) other means to prove L.R.H.'s alleged level of intoxication.

### 2. Evidence that L.R.H. allegedly made sexual advances towards Isaac

Pablo also argues that the district court erred in excluding proffered evidence that, on the night of the rape, L.R.H. made sexual advances towards his co-defendant, Isaac— namely, caressing his leg and penis through his pants and trying to kiss him. As noted previously, the timing of these alleged sexual advances is not made clear by the two proffers advanced by Isaac's counsel.[22] Under either proffer, however, Isaac intended to testify that L.R.H made these alleged sexual advances a significant period of time before the rape occurred, in a different car than where the rape occurred, and in a different location than where the rape occurred. And we need not definitively resolve the inconsistencies in these two proffers because we would reach the same result irrespective of which proffer more accurately represents Isaac's proposed testimony.

On appeal, Pablo asserts that the evidence of these earlier sexual advances falls within the Rule 412(b)(1)(C)'s exception to Rule 412's general rule of exclusion because

---

[22] Isaac's counsel made two proffers with respect to this evidence. One proffer indicates that the alleged sexual advances were made in the backseat of the Chevy Cavalier as Dave Keetso drove it to pick up his truck so that he could pull Isaac's Ford Focus from the ditch. Another proffer, however, occurred during Isaac's testimony, and it indicates that the alleged sexual advances occurred even earlier. Contrary to Dave Keetso's testimony that Isaac only entered his Cavalier when they went to pick up Dave's truck, Isaac testified that he had jumped into the backseat of Dave's Cavalier earlier that night while they were still driving along the back roads before Isaac's car got stuck in a ditch. The timing and content of this second proffer suggest that Isaac sought to testify that L.R.H. made the alleged sexual advances in the back of the Cavalier at this point while they were still cruising around on back roads.

33

the inability to present this evidence deprived him of his constitutional right to present a defense.[23] He explains that Pablo was accused of raping L.R.H. only a short time after Isaac raped her. Consequently, he argues that Pablo necessarily had first to prove L.R.H. consented to sex with Isaac in order to prove that she also consented to sex with him; otherwise, his consent defense could not have succeeded because no rational jury would believe that a victim would consent to sex with a man just moments after being raped by that man's cousin. Pablo, however, failed to raise a Rule 412(b)(1)(C) argument with respect to this evidence in the district court.[24] Therefore, we review Pablo's alleged error

---

[23] In his opening brief, Pablo asserted a belief that Isaac should have been allowed to introduce this evidence under Rule 412(b)(1)(B) because he was offering it to prove L.R.H. consented to sex with him. But with respect to his own argument for why this evidence should have been admitted, Pablo's opening brief argues only that the district court's failure to admit the evidence when Isaac sought to introduce it deprived him of his constitutional right to present a defense, thereby running afoul of Rule 412(b)(1)(C). In his reply brief, however, Pablo raises for the first time two arguments for why we should find error under Rule 412(b)(1)(B): (1) that because Isaac could raise an arguable claim that the evidence should have been admitted under Rule 412(b)(1)(B), Pablo should be able to raise that error on appeal as well because they were tried as codefendants; and (2) that the term "accused" in Rule 412(b)(1)(B) covers him and Isaac and allows him to raise his own Rule 412(b)(1)(B) argument because he and Isaac were codefendants accused of raping L.R.H. within a short period of one another and they were jointly relying on a consent defense. Because Pablo failed to raise these arguments in his opening brief and failed to cite any relevant authority to support his arguments (though he did note that the Tenth Circuit has not addressed his second argument), we treat Pablo as having waived these arguments. See Smith, 606 F.3d at 1284 n.5; Hardwell, 80 F.3d at 1492.

[24] In his untimely Rule 412(c) motion, Pablo made a general assertion that he would introduce evidence of consent and further asserted that his right to present evidence of consent "falls squarely within [his] constitutionally-guaranteed rights to mount a defense." (Supp. R. vol. 2 at 15.) But this motion failed to identify any specific piece of evidence Pablo intended to introduce, much less the evidence related to L.R.H.'s alleged sexual advances towards Isaac. In fact, Pablo appears to have used this motion simply to notify the district court that he would testify that, at the time of the rape, L.R.H. initiated

34

under a plain error standard of review. Because we conclude that Pablo failed to satisfy the third prong of plain error review, we need not address the other Olano prongs, although we believe Pablo would likely fail on those prongs as well.

Again, in order to satisfy the third prong of plain error review— that the error affects substantial rights—Pablo must show a "reasonable probability" that but for the exclusion of the evidence the jury would not have convicted him. Gonzalez-Huerta, 403 F.3d at 732-33 (quotation omitted). Pablo has failed to make this showing. The district court prohibited Isaac from testifying that L.R.H. made sexual advances towards him. These alleged sexual advances, however, occurred some time before the alleged rape and in a different location from where the alleged rape occurred, which undermines the

---

the sexual contact and consented to intercourse. He does not appear to have been attempting to notify the district court of any evidence of prior sexual contacts between L.R.H and him or L.R.H. and Isaac.

Pablo and Isaac also jointly filed an additional Rule 412(c) motion that did identify some specific Rule 412 evidence they intended to offer. However, none of that proffered evidence related to L.R.H.'s alleged groping of Isaac in the back of a car prior to the rape.

The only time constitutional rights were ever mentioned in the context of Isaac's ability to testify about L.R.H.'s alleged sexual advances in the back of a car prior to the rape occurred when counsel for Pablo's codefendant made a passing comment that exclusion of this evidence "almost" seems like it implicates Isaac's "due process rights." (R. vol. 3 pt. 1 at 389.) Isaac's counsel never made any reference to Pablo's constitutional rights. And Pablo's counsel never did so either, nor did he give any indication that he was adopting Isaac's objection as his own. In fact, during the colloquy addressing the admissibility of this evidence, Pablo never raised any argument, much less one related to his constitutional right to present a defense. Thus, Pablo failed to put the district court on notice of his Rule 412(b)(1)(C) argument. Cf. Fortier v. Dona Anna Plaza Partners, 747 F.2d 1324, 1331 (10th Cir. 1984) (refusing to treat one defendant's objection as an objection for another defendant where the objection was clearly not made on behalf of the other defendant).

evidence's probative value for consent. Moreover, Isaac was able to testify that L.R.H.'s boyfriend seemed jealous of him because L.R.H. had been speaking with him at the dance. And the district court allowed both Isaac and Pablo to testify to other facts tending to show she consented to sex. Yet, the jury disbelieved the defendants' testimony in this regard. Thus, we discern little likelihood that a jury that discredited the defendants' testimony on consent would change its evaluation of the defendants' credibility because of Isaac's self-serving testimony of earlier alleged sexual advances in a different location, particularly given the presence of other inconsistencies and gaps in the defendants' testimony.

Moreover, even if this evidence would convince a jury that L.R.H. consented to sex with Isaac, it would not have a reasonable probability of convincing the jury that L.R.H. consented to sex with Pablo; in fact, it would prove the opposite. L.R.H. suffered severe vaginal injuries consistent with forcible vaginal penetration. The evidence adduced at trial indicates that these injuries resulted from either Isaac, Pablo, or both. And Pablo had sex with L.R.H. <u>after</u> Isaac. Thus, if the jury believed that L.R.H. consented to sex with Isaac, the jury would be left with conclusion that Pablo caused L.R.H.'s vaginal injuries in the course of rape.

Accordingly, we conclude that Pablo has failed to satisfy the third prong of plain error review.

36

## CONCLUSION

For the reasons discussed above, we conclude that none of the claims raised by Pablo on appeal entitle him to relief from his conviction.  Therefore, we affirm his conviction.

AFFIRMED.

No. 09-2091, United States v. Pablo, No. 09-2091

**BRISCOE**, Chief Judge, concurring.

I concur and write only to address the Confrontation Clause issue addressed by the majority. In my view, it is unnecessary to decide whether, in light of Williams v. Illinois, 132 S. Ct. 2221 (2012), the district court committed plain error in admitting Snider's testimony. That is because, even assuming it was plain error, Pablo cannot establish that the admission of Snider's testimony violated his substantial rights. Snider testified as an expert witness regarding the DNA analysis and serology analysis performed by the crime lab. Her testimony "conveyed to the jury that the DNA analysis connected Pablo to DNA found on [the victim]'s genitalia as well as to a condom found at the scene of the rape." Maj. Op. at 7. That Pablo had vaginal sex with the victim, however, was undisputed. Three witnesses — the victim, Isaac, and Pablo himself — all testified, consistent with the DNA analysis, that Pablo had vaginal sex with the victim. The key difference in these witnesses' testimony was whether the sex was forcible, as the victim and Isaac testified, or consensual, as Pablo testified. As the majority correctly concludes, Snider's testimony had no impact on the jury's resolution of this singularly critical issue. Id. at 20-23.