**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

PEDRO GARCIA,

     Defendant - Appellant.

Nos.  14-3006 & 14-3081

UNITED STATES OF AMERICA,

     Plaintiff – Appellee,

v.

GONZALO RAMIREZ,

     Defendant – Appellant.

No. 14-3039

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. Nos. 6:12-CR-10089-MLB-2 and 6:12-CR-10089-MLB-3)**

J. Val Wachtel, Klenda Austerman LLC, Wichita, Kansas for Appellant Pedro Garcia.

Andrew J. McGowan, Assistant Federal Public Defender, (Melody Brannon Evans, Federal Public Defender, with him on the brief), Topeka, Kansas, for Appellant Gonzalo Ramirez.

James A. Brown, Assistant United States Attorney (Barry R. Grissom, United States Attorney, with him on the brief), Topeka, Kansas, for Appellee.

---

Before **HARTZ**, **TYMKOVICH**, and **PHILLIPS**, Circuit Judges.

---

**HARTZ**, Circuit Judge.

---

Defendants Pedro Garcia and Gonzalo Ramirez were convicted of conspiring with other members of their criminal gang to violate the Racketeer Influenced and Corrupt Organizations Act (RICO), *see* 18 U.S.C. § 1962(d). They were also convicted of committing various violent crimes in aid of racketeering, *see id.* § 1959 (VICAR), and multiple firearm counts, *see id.* § 924(c)(1)(A). They challenge their convictions, arguing that (1) the government violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose promises made to a key cooperating witness; (2) the government put on false evidence at trial in violation of *Napue v. Illinois*, 360 U.S. 264 (1959); (3) the jury was incorrectly instructed that the jurisdictional element of RICO requires showing only a minimal effect on interstate commerce; (4) VICAR was unconstitutionally applied because their violent crimes did not affect interstate commerce; and (5) the court erroneously admitted testimonial hearsay under the guise of a gang expert's opinion, in violation of the Confrontation Clause.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm. We hold that (1) the government did not violate *Brady* because the undisclosed evidence was not material; (2) the government did not violate *Napue*; (3) the challenge to the interstate-commerce

jury instruction on the RICO charge fails because it is based on the false premise that there was no evidence that the RICO enterprise engaged in economic activity; (4) the challenge to the VICAR convictions fails because it is based on the same false premise; and (5) testimonial hearsay was erroneously admitted but harmless because it was cumulative of other testimony.

## I. BACKGROUND

### A. The Evidence at Trial

According to trial testimony by Shane Webb, a government "gang expert" and former Dodge City, Kansas police officer, the city was home to four rival gangs from at least 2008 to 2012. The Diablos Viejos (DVs) and Los Carnales Chingones were "sets" under the Norteños (Northerners) gang. Ramirez R., Vol. III at 926. Members of both sets wore red. Their rivals, who wore blue, were the Master Criminal Boys and 18th Streeters, sets under the Sureños (Southerners) gang. The DVs, to which Defendants belonged, engaged in criminal activity including assaults, batteries, robberies, shootings, homicides, and drug trafficking. Trial testimony concerned both the general criminal activities of the gang and three criminal incidents in particular.

#### 1. The House Shooting

The first incident involved Defendant Ramirez (but not Defendant Garcia), who was convicted of wounding two victims by shooting into their house. Juan Torres, a DV member, was the principal witness to the events. On the night of October 4, 2008, Ramirez drove Torres, Angel Cerda, and two women to the house of the Hernandez

3

family. An altercation erupted between those in the vehicle and several men outside the house. Enraged, Ramirez drove with his passengers back to his house, where he picked up a rifle. They returned to the Hernandez neighborhood, parking in an alley near the Hernandez house. Ramirez, rifle in hand, ran through the alley and turned a corner toward the house. At least 19 shots were fired at the house. One hit the sleeping Rumalda Hipolito in the arm, and another hit her son, 18-year-old Abel Hernandez, in the leg. Ramirez returned to his car and drove it to Cerda's property, parking the car in a barn. Cerda went to his house while the others fled into a nearby field, hiding in the tall grass until the coast was clear.

### 2. The Home-Invasion Robbery

The next incident involved both Defendants. Jesus Flores was the principal witness. On June 8, 2009, Defendants and at least two others affiliated with the Norteños, Jesus and Josh Flores, robbed the occupants of a house. That evening Defendants and the Floreses were at Garcia's house when they left to go look for "scraps," *id.* at 1727, meaning Sureños. Jesus Flores and Ramirez (and perhaps others) had guns. The group traveled through the alley behind Garcia's house for a couple of blocks before stopping to break into the house of Isidoro Raleas-Velasquez, a Guatemalan immigrant. After Ramirez checked things out by peering through a side window, he and the others entered the house through the front door. Raleas and another occupant, Alonzo Diego-Hemon, were in the living room watching television when the invaders burst in. Ramirez grabbed Raleas and struck him on the head with his pistol.

4

Ramirez (and perhaps others) then took Raleas into his bedroom and stole $800 in cash. While this was going on, Diego was forced to the ground at gunpoint. The other assailants acted as lookouts and rummaged through the house for items to steal. The group returned to Garcia's house and split the money.

### 3. The Trailer-Park Shooting

After the home-invasion robbery, Defendants and two other Norteños, cousins Anthony Wright and Russell Worthey, continued the night's criminal activities. Several witnesses testified about the events.

### a. Wright's Account

According to Wright, late in the afternoon of June 8 he drove his girlfriend's gold Mazda to Worthey's house and picked him up. They drove around Wright's trailer park and spotted a group of people having a party in front of a trailer. All were wearing blue, so Wright decided that they were Sureños.

After dark they drove to Garcia's house, knocked on the back door, and waited. A few minutes later, as they were about to leave, they saw Defendants and Jesus and Josh Flores down the alley, running toward the house. At least some of them had red bandanas over their faces. Everyone went inside the house to the living room. Wright saw Defendants and the Floreses splitting up some cash. They told him that they had just completed a home invasion. Wright also saw that Defendants and Josh Flores had firearms, and Jesus probably did as well. Someone suggested they go look for Sureños.

5

Everyone left. Wright, Worthey, and Defendants got into the Mazda. Wright drove, Worthey sat in the front passenger seat, Garcia sat in the back-left passenger seat, and Ramirez sat in the back-right passenger seat. Defendants each had a gun. Recalling that he had seen Sureños in the trailer park earlier in the day, Wright drove there. They drove by the people in blue he had seen earlier, who were still in front of their trailer. After parking some distance away, the four men got out of the car and headed through the trailers toward the group. Defendants were in the lead, with guns in their hands and bandanas over their faces.

They approached the group from behind their trailer, then came around to the front. Someone said "puro Norte" (pure north), and Defendants opened fire while the victims attempted to flee. *Id.* at 1289. Wright and Defendants ran back to the car, sitting in the same seats as before. They then picked up Worthey. As they drove off, Ramirez said to Garcia, "[Y]ou got that one." *Id.* at 1291. Sometime later Garcia made a comment about everyone having kids, which Wright understood to mean that they should be quiet about the shooting to protect their families. Wright dropped off Defendants, then Worthey.

### b. Worthey's Account

Worthey's testimony matched Wright's in most respects. On June 7 (the day before the shooting) he was picked up by Wright and they drove to a trailer park, where they saw two persons outside on a porch. Wright flashed a gang sign at them, but they did not respond. Wright said that Sureños lived at that house.

6

The next day, June 8, as it was getting dark Wright picked up Worthey at his house to go cruising in Wright's gold Mazda. They eventually drove to Garcia's house, knocked on the back door, and turned to leave when nobody answered. But they then heard rapid footsteps and saw Defendants and the Floreses approaching from the alley. Two of the four had bandanas over their faces. Everyone went inside. Worthey saw that Josh Flores had a pistol, but he did not see any cash.

Defendants, Worthey, and Wright then got into Wright's Mazda to go for a cruise. Worthey did not see either Defendant with a gun. Wright drove, with Worthey in the front passenger seat, Garcia in the back-left passenger seat, and Ramirez in the back-right. In the car Defendants discussed a home invasion that, Worthey gathered, had just taken place. After cruising around for an hour or so, the group drove to the trailer park. As they approached the location of the eventual victims, Wright said that there were some Sureños who lived nearby. They drove by the victims' trailer and saw a group of men outside drinking beer. "[W]e're going to get these mother fuckers," Garcia said. *Id.* at 1476.

Wright parked the car some distance away. He and Defendants got out of the car, and Defendants put bandanas over their faces. Worthey was hesitant to follow, but Ramirez said to him, "Let's go home boy." *Id.* at 1479. Worthey understood this as an order from the high-status Ramirez that he had to go with the group or else suffer a "violation," *id.* at 1481, meaning a beating or other discipline. Worthey followed the rest of the group as they approached the trailer immediately behind the victims. They came

7

around to the front of the trailer in a line, with Garcia in front, then Ramirez, then Worthey, then Wright. Garcia shouted "puro Norte" and Ramirez pulled out a revolver. *Id.* at 1485. Worthey heard shots and ran. Although he did not see any of the shooting, he heard too many shots for them to have come from only Ramirez's revolver.

After the shooting, Wright in his gold Mazda picked up Worthey, who got into the front passenger seat. Defendants were already in the car, in the same seats as before. As they drove away, Garcia said, "I got that one, I got him," and Ramirez responded, "[Y]eah, you got him," *id.* at 1491. Worthey took this to mean that Garcia had shot someone. Garcia said that he knew he got him because of how he fell over a fence. He told the others to keep their mouths shut because they had kids. Wright dropped off Defendants in Dodge City, then dropped off Worthey.

### c.    Other Witnesses

Other witnesses also testified about the trailer-park shooting. Officers who arrived at the trailer park later that night said that they recovered 10 spent shell casings and one live round, and that they found one person dead, killed by a single bullet to the back.

One of the men targeted testified that he saw three or four men and heard gunshots, but everything happened too quickly for him to notice the clothing or faces of the attackers. Another testified that he thought there were four or five gunmen, but he ran before he could get a good look at them. He heard gunshots and saw bullets kick up sand on the ground.

8

Two bystanders saw part of what happened.  Ricardo Sanchez was in his trailer that night.  He said that at about 11:00 p.m. he heard a car speed by his trailer and suddenly stop.  Through a television monitor connected to a security camera outside his trailer he saw four men exit a small four-door car.  One had a gun, and one, perhaps the same person, had a bandana over his face.  The group ran behind his trailer, several shots were fired, and two of the men returned to the car and left.

The second bystander, April Solis, was babysitting in a nearby trailer.  She stated that sometime between 10:00 p.m. and midnight she heard popping noises that she first thought were fireworks but soon concluded were gunshots.  She heard a group of people running and a vehicle pull up nearby.  Peeking out the trailer window, she saw a grey four-door car driven by a pale man.  Contrary to the testimony of Wright and Worthey (who said that Worthey sat in the front passenger seat and did not have a gun), she said that someone with a gun got in the front passenger seat and put the gun in the center console before the vehicle drove away.

Two DV members also testified about the night of the shooting.  Joe Galindo stated that Ramirez called to get a ride that night, saying that it was a Norteño matter.  He found Defendants on a Dodge City street and drove them to Ramirez's house.  Galindo observed that "something was wrong because [Ramirez]'s prancin' around.  He was just walkin' around like showin' something was wrong."  *Id.* at 1600.  Garcia "was just shakin' his head."  *Id.* at 1601.  Galindo asked Defendants what was wrong, and Garcia said that "a scrap died tonight. . . . [T]here was a scrap, a Sureno, trying to jump over the

9

fence and . . . he [Garcia] shot him in the back—or just shot him, and that the last words that Sureno heard was Norte puro." *Id.* at 1602. Ramirez laughed. Garcia joked that Ramirez's gun jammed, and Ramirez agreed that his gun had jammed. Defendants told Galindo not to tell anyone.

The other DV member, Fabian Neave, testified that Garcia had confessed to him while they were both in jail. Garcia said that Wright and Worthey told him about the Sureños in the trailer park, that they drove there, and that Garcia had used a TEC-9 firearm to shoot at the Sureños.

## B.     Procedural History

On April 16, 2012, Defendants and 21 others affiliated with the Norteños were indicted in the United States District Court for the District of Kansas. Both Defendants were charged with (1) a conspiracy to violate RICO, based on the Norteños' drug trafficking and violent crimes; (2) four VICAR offenses and discharge of a firearm in furtherance of a crime of violence, based on the trailer-park shooting; and (3) two VICAR offenses and brandishing of a firearm in furtherance of a crime of violence, based on the home-invasion robbery. In addition, Ramirez was charged with three VICAR offenses and discharge of a firearm in furtherance of a crime of violence, based on the house shooting.

Of the other 21 defendants, 20 pleaded guilty and one was dismissed. After trial from October 2 to October 17, 2013, Defendants were found guilty by a jury on all counts. Garcia was sentenced to life imprisonment plus 32 years, and Ramirez was

10

sentenced to life imprisonment plus 57 years.  The district court denied Defendants'

motions for a new trial on *Brady* and *Napue* grounds, and they now appeal.

## II.    DISCUSSION

### A.    *Brady*

"[T]he suppression by the prosecution of evidence favorable to an accused upon

request violates due process where the evidence is material either to guilt or to

punishment, irrespective of the good faith or bad faith of the prosecution."  *Brady*, 373

U.S. at 87.

#### 1.    The Claim

Defendants claim that they are entitled to a new trial because the government

failed to disclose promises made to key prosecution witness Worthey.  Although they

were informed of the written plea agreement between Worthey and the government, they

were not told of a recorded conversation in which the government spoke of "work[ing]

down from thirty" years' imprisonment and assured Worthey that the government would

also take into consideration his cooperation in an unrelated state murder case.  Ramirez

R., Vol. II at 781.  According to Defendants, the failure to disclose the promises

prevented them from (1) showing that Worthey was "willing to do anything to curry

favor" with the government, and (2) exposing that the sentence he was facing was far less

than the "natural life" term he testified to on the stand.  Ramirez Aplt. Br. at 61–62

(internal quotation marks omitted).  To evaluate these claims, we must review what was

11

disclosed before or at trial about the history of Worthey's cooperation with the prosecution.

Worthey at first did not cooperate. He was interviewed by Dodge City detectives 10 days after the trailer-park shooting (June 17, 2009) and falsely denied involvement. In a November 2010 meeting with then-Detective Webb, Worthey again denied involvement and requested a lawyer. On May 9, 2012, after he was indicted in this case, Worthey declined to speak with law enforcement without a lawyer.

Two weeks later, however, Worthey began cooperating. On May 22 he met with law enforcement and began to "tell the truth." Ramirez R., Vol. III at 1542. He followed up with discussions on August 8 and December 17. On May 13, 2013, he signed a plea agreement, which included a statement of facts substantially identical to his trial testimony. At trial, Defendants' counsel cross-examined Worthey about his earlier denials of involvement but raised no discrepancies between his 2012 interviews and his plea-agreement statement or his testimony.

Defendants cross-examined Worthey at length about the promises in his plea agreement. Worthey acknowledged that in exchange for his guilty plea and testimony against Defendants the government would dismiss four of his six charges, refrain from filing additional charges, recommend an offense-level reduction under the sentencing guidelines, and file a substantial-assistance motion to further reduce his sentence.

What was not disclosed before the verdict were two meetings between Worthey and law enforcement. The first was on March 15, 2013, two months before Worthey

executed the plea agreement and six-and-a-half months before trial. Worthey and his

attorney met with Special Agent Steven Gravatt and Assistant United States Attorney

(AUSA) Lanny Welch, one of the attorneys who would prosecute Defendants at trial. A

transcript of the meeting reveals that Welch told Worthey that he was likely to get a

sentence of less than 30 years:

> I talked to [Department of Justice officials in Washington] this morning and they said it's gotta be the RICO count and the gun count because that's 30 years and we can work down from 30. I know that doesn't make you happy, but . . . Russell, I can't promise you everything. Cause it's the judge's decision in the end, okay, so . . . we could do everything for you that we say we're going to do, and the judge still says, "Nah, I don't care." But I don't think that's going to happen. I've done a lot of cases with this judge and I've done a lot of murder cases with this judge, okay? And he has been very good about following our recommendations in the past, alright. And we're going to tell him that you and Anthony [Wright] cooperated from the start. . . .

*Id.*, Vol. II at 781 (spelled-out numbers and parentheses omitted).

The discussion then turned to Worthey's cooperation in an unrelated state-court

murder case against Jerone Brown. Worthey was assured a benefit for his cooperation in

that case as well:

> Welch: . . . I'm gonna leave here shortly. There's going to be a homicide detective from the Wichita PD come in to talk to you about this other thing, okay.
> Worthey: Yeah.
> Welch: Now, uh, *if you give them information that helps them lead to new charges, then we're gonna take that into consideration also*.
> Worthey: Okay.
> Welch: We, *we will help you with your recommendation* . . . as we always said, just be honest. Tell them what you know. If it works out, great, okay?

13

*Id.* at 782 (emphasis added).

The second meeting was on June 14, 2013. According to Defendants' posttrial pleadings, Worthey met with Special Agent Gravatt and a local detective to provide information about the state case. On June 18, Worthey testified at a preliminary hearing in the state case that in jail he had heard Brown talk about his involvement in two murders (unrelated to the Norteños or Defendants). On January 6, 2014, the government filed a motion to reduce Worthey's sentence to 120 months, citing his cooperation against Defendants and others in this case, his testimony at the state preliminary hearing, and his expected testimony at the state trial. That same day, Worthey testified at Brown's trial and Defendants were sentenced in this case.

On January 14, 2014, Ramirez's counsel learned from a newspaper article that Worthey had testified at the state trial. Soon after, both Defendants moved for a new trial on *Brady* grounds. The government's response in opposition—filed on January 27, the same day Worthey received the reduced, 120-month sentence that the government had requested earlier that month—falsely stated that Worthey "had been offered nothing in return by federal and state authorities" for his cooperation in the state case, *id.* at 226, a position the government reiterated in later filings on January 31 and February 19. After much briefing, which included an eventual concession from the government that Worthey *did* receive a benefit for his state-court cooperation, the district court denied the motions.

14

## 2. Analysis

To establish a *Brady* claim, "the defendant must prove by a preponderance of the evidence:  (1) the government suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material."  *United States v. Reese*, 745 F.3d 1075, 1083 (2014).  "Evidence is *material* if there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed."  *Id.*  "A *reasonable probability* means the likelihood of a different result is great enough to undermine confidence in the outcome."  *Id.* (internal quotation marks omitted).  When a defendant appeals the denial of a *Brady* motion, we review the district court's underlying factual findings for clear error and its ultimate ruling de novo.  *See id.*

The government concedes that its failure to disclose Worthey's March and June meetings satisfies the first two elements of the *Brady* test.  Therefore, Defendants' claim turns on whether the suppressed evidence was material.  We hold that it was not.

Several considerations convince us that disclosure of the meetings would not have affected the verdict.  Turning first to the failure to disclose Worthey's state-court cooperation, we do not see, and Defendants do not explain, how the promise of leniency for testimony in a state proceeding would influence the witness's testimony in a federal trial about a totally different crime.  It is one thing to say, as courts often have, that a promise of leniency in return for favorable testimony can induce a witness to embellish or even falsify that testimony.  *See, e.g.*, *Douglas v. Workman*, 560 F.3d 1156, 1174–75 (10th Cir. 2009) (per curiam) (prosecution failed to disclose agreement with witness in

15

exchange for his trial testimony).  But it is quite another to suggest that a witness will commit perjury in one case because he may receive a benefit from testifying in a wholly unrelated case.  Here, the prospective benefit to Worthey from offering information about the state offense could induce him only to embellish his testimony about *that* case. AUSA Welch told Worthey, "[I]f you give [the Wichita police department] information that helps them lead to new charges, then we're gonna take that into consideration also." Ramirez R., Vol. II at 782.  Worthey may have had reason to provide false information about the state-court defendant in hopes of a lighter sentence in this case.  But that does not impugn his testimony against Defendants.

Defendants suggest that Worthey's testimony in the state case established that he was "willing to do anything to curry favor with prosecutors for a lower sentence." Ramirez Aplt. Br. at 62.  But we do not think that this argument adds substantially to the impeachment of Worthey's credibility.  In *United States v. Trujillo*, 136 F.3d 1388 (10th Cir. 1998), we rejected the same argument when the undisclosed cooperation of the witness concerned, unlike here, information adverse to a *friend* of the witness.  The defendant argued that the *Brady* violation was material because it would "demonstrate to the jury [that the witness] is the kind of person who would implicate anyone, including a friend, regardless of the truthfulness of his statements if it would benefit him."  *Id.* at 1393 (internal quotation marks omitted).  We held, however, that the undisclosed evidence was not material but merely cumulative, observing that "[t]he jury was well

16

aware of [the witness's] criminal propensities and motive for testifying that [the defendant] committed the . . . robbery." *Id.* at 1394. So too here.

As for the assurance to Worthey that the government would "work down from thirty," Ramirez R., Vol. II at 781, this undisclosed information was also immaterial because the trial evidence had clearly established that Worthey would likely be receiving a reduced sentence in exchange for his cooperation. Worthey admitted that the sentencing guidelines indicated that he would be sentenced to less than life imprisonment and that his plea agreement provided that the government would bring no further charges and would file a motion to reduce his sentence.

Moreover, the timing of the undisclosed meetings forecloses the possibility that they corrupted Worthey's testimony. Worthey provided information to law enforcement on at least three occasions in 2012. Defendants do not direct us to any differences between Worthey's statements at the 2012 meetings and his testimony at trial, and no differences were elicited at trial. We fail to see how any assurances given Worthey at the 2013 meetings influenced his testimony when the substance of that testimony had previously been communicated to law enforcement. *See Mastracchio v. Vose,* 274 F.3d 590, 604 (1st Cir. 2001) ("The fact that [the witness] had staked out his position well before he received any emoluments renders remote any possibility that the jury would have thought that he had fabricated his story in return for cash.").

We also note that Defendants vigorously impeached Worthey at trial. He acknowledged that the sentencing guidelines indicated that he would most likely be

17

sentenced to less than life imprisonment; that his plea agreement provided that the government would bring no further charges and would file a motion to reduce his sentence because of his guilty plea, his adoption of a statement of facts incriminating Defendants, and his commitment to testify against Defendants; and that the government could renege if it did not like his testimony. He also admitted that he was a gang member; that he had fought rival gang members; that he managed the gang's money to help imprisoned gang members and to buy drugs and guns; that he used drugs and had once traded some speakers and an amplifier for methamphetamine when he was 14 or 15; that he had been convicted of two felony burglaries; that he had pleaded guilty to an assault involving a tire iron; that he had once gotten into a fistfight with Defendant Ramirez; that he was a cousin of fellow cooperating witness Wright; that pending state charges for assault were dropped only because the federal government decided to prosecute this case; and that before his arrest he had lied about his involvement in the trailer-park shooting. Further, the jury was instructed to treat with greater care the testimony of a witness who provides evidence in exchange for personal advantage. And in closing argument, counsel for both Defendants emphasized Worthey's plea agreement as a reason not to believe him. Any additional impeachment stemming from the undisclosed meetings "would have provided only marginal additional support for the defense" and was not material. *United States v. Cooper*, 654 F.3d 1104, 1120 (10th Cir. 2011) (brackets and internal quotation marks omitted); *see United States v. Page*,

18

808 F.2d 723, 730 (10th Cir. 1987) (failure to disclose additional arrest immaterial under *Brady* when witness impeached with seven felony convictions).

As a final effort, Defendants contend that nondisclosure of Worthey's meetings was material because they could have used that information to expose Worthey's misstatements on direct examination about his contacts with the government. Defendants focus on Worthey's omission of the March meeting when he was asked how many times he had met with the government. Yet even though Worthey did not mention the March meeting, it does not follow that, had the Defendants been informed about the meeting, they would have been able to exploit Worthey's omission. Defendants' argument assumes that the government would have disclosed the meeting to Defendants yet forgotten to remind Worthey about it before trial or raise it on direct examination. We do not think that sequence of events is plausible.

We recognize that Worthey was a very important witness and conviction was hardly assured. But these considerations are no substitute for the absence of impeachment value in the undisclosed evidence. Although we disapprove of the government's nondisclosure and its responding to Defendants' posttrial motions with false denials (which, at best, were the result of gross incompetence), we hold that the nondisclosure was immaterial. Defendants' *Brady* challenge fails.

## B. *Napue*

Defendants raise a claim under *Napue*, 360 U.S. at 269, which held that the Due Process Clause would be violated if the prosecutor knowingly failed to correct perjured

19

testimony in its case, even when the evidence went only to the credibility of the witness. A *Napue* violation occurs when (1) a government witness committed perjury, (2) the prosecution knew the testimony to be false, and (3) the testimony was material. *See United States v. Caballero*, 277 F.3d 1235, 1243 (10th Cir. 2002). We review for clear error the district court's factual findings on the first two elements. *See Smith v. Sec'y of N.M. Dep't of Corr.*, 50 F.3d 801, 828 (10th Cir. 1995). The false testimony is material "unless failure to disclose [the perjury] would be harmless beyond a reasonable doubt." *United States v. Bagley*, 473 U.S. 667, 680 (1985).

Defendants assert that the government countenanced the false testimony of Worthey and Special Agent Gravatt when each omitted to mention meetings between Worthey and the government after being asked questions that should have caused them to disclose the meetings. Their *Napue* claim closely resembles their *Brady* claim. Indeed, one's first instinct might be to reject the *Napue* claim on the same ground that the *Brady* claim was rejected—lack of materiality—because the nondisclosure in both claims is essentially the same—the failure to disclose two meetings between Worthey and government agents. But there is an important difference. The materiality standard is not the same for the two claims. Under *Brady* the standard is whether "there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed." *Reese*, 745 F.3d at 1083. Under *Napue* materiality is easier to establish: the failure to disclose is material unless it was harmless beyond a reasonable doubt.

20

There is a reason that the materiality standard for *Napue* violations is more easily satisfied. A defendant may have a *Brady* claim if the witness *unintentionally* gave false testimony or the prosecution did not correct testimony that it *should have known* was false. *See Smith*, 50 F.3d at 831. But this court has repeatedly spoken of *Napue* claims as requiring perjury by the witness, *see, e.g.*, *United States v. Crockett*, 435 F.3d 1305, 1316–17 (10th Cir. 2006); *Tapia v. Tansy*, 926 F.2d 1554, 1563 (10th Cir. 1991); *McBride v. United States*, 446 F.2d 229, 230 (10th Cir. 1971), and the prosecutor's knowledge of the falsity, *see Crockett*, 435 F.3d at 1317; *Caballero*, 277 F.3d at 1243; *Smith*, 50 F.3d at 831 (failure of detective to convey information to prosecutor precluded *Napue* claim, but *Brady* claim survives). A prosecutor's knowing use of perjured testimony is misconduct that goes beyond the denial of a fair trial, which is the focus of *Brady*. It is misconduct that undermines fundamental expectations for a "just" criminal-justice system. As the Supreme Court expressed the point, "[T]he knowing use of perjured testimony . . . involves a corruption of the truth-seeking function of the trial process." *Bagley*, 473 U.S. at 680 (internal quotation marks omitted); *accord Smith*, 50 F.3d at 826 n.38 (explaining difference between materiality standards under *Napue* and *Brady*).

Defendants, however, have failed to establish the elements of a *Napue* claim. We first address Gravatt's testimony (about which only Ramirez complains). The alleged false testimony involved his denial of any recorded meetings:

Q. As part of the investigation, you mentioned some debriefings?

21

A. Yes.
Q. Following the Indictment in this case, uhm, you or some officer with the ATF participated with maybe Detective Bice in meeting with—you've been here all this—many of the witnesses we've seen?
A. Yes.
Q. Were any of those meetings recorded?
A. No.
. . . .
Q. And you understand if those meetings are recorded, you're required to turn them over to defense counsel?
A. Yes.

Ramirez R., Vol. III at 2436–37. On redirect examination, Gravatt was asked, "after all of these debriefings, were reports generated that were turned over to the defense in this case?" *Id.* at 2437. He responded, "Every single one, yes." *Id.*

Ramirez contends that this testimony was false because Gravatt attended Worthey's March and June 2013 interviews, both of which were recorded. The district court disagreed, finding that Gravatt understood defense counsel's imprecise questioning to refer to a series of proffer meetings attended by him and Detective Bice and that Gravatt truthfully responded that none of those meetings was recorded. This is not a clearly erroneous interpretation of the testimony. Consequently, Gravatt's testimony did not violate *Napue*.

As for Worthey, the challenged testimony involves his omission of the March and June meetings during the cross-examination mentioned earlier:

Q. After your arrest in this case, how many times did you meet with the Government?
A. Three times.
Q. Do you remember when those occasions were?
A. No.

22

Q. You met with them on May 22nd of 2012; is that correct? A few weeks after you were first arrested?
A. Correct.
Q. And then again on June 14th, 2012?
A. I don't know about that one. I met once in August and once in December.
Q. Okay. You remember meeting on August 8th of 2012?
A. Correct.
Q. And then again on December 17 of 2012?
A. Correct.
Q. And then since that time, have you met with the Government at all?
A. Only on [sic] just to let me know that I was coming to testify.
Q. And when was that?
A. Like three weeks ago.

*Id.* at 1547–48.

The district court found that Worthey's omission of the meetings did not amount to knowing false testimony or perjury, and that the prosecutor did not knowingly fail to correct Worthey's testimony but simply failed to recall the meetings during the testimony. Defendants argue that it is clear that Worthey's omission was intentional. We disagree. We can imagine no reason why Worthey would admit to three other meetings with the government yet purposely conceal the March and June meetings. As already discussed, any additional impeachment of or embarrassment to Worthey from revealing the meetings was minimal compared to the deluge of material about Worthey's checkered past already divulged to the jury. And the meetings were brief, further suggesting that Worthey could have forgotten about them. The district court's determination that Worthey did not commit perjury is not clearly erroneous.

23

Likewise, the district court could credit the prosecutor's statement that he had forgotten the meetings. Indeed, Defendants present no serious challenge to that finding by the court. We therefore reject the *Napue* claim.

## C.    RICO

Defendants were charged under RICO, 18 U.S.C. § 1962(d), with conspiring to violate 18 U.S.C. § 1962(c). Section 1962(c) states:

> It shall be unlawful for any person employed by or associated with *any enterprise engaged in, or the activities of which affect, interstate or foreign commerce,* to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c) (emphasis added). Defendants do not take issue with the district court's jury instructions explaining the meanings of *conspiracy*, *enterprise*, or *pattern of racketeering activity*. But they challenge the following portion of the instruction explaining what is required for the activities of the enterprise to affect interstate commerce: "The evidence also need not show any particular degree of an effect on interstate commerce. The government is not required to prove a significant or substantial effect on interstate or foreign commerce. Rather, a minimal effect is sufficient." Ramirez R., Vol. I at 1243. They argue that more than a minimal effect was required in this case.

"We review de novo the jury instructions as a whole and view them in the context of the entire trial to determine if they accurately state the governing law and provide the jury with an accurate understanding of the relevant legal standards and factual issues in

24

the case." *United States v. Bedford*, 536 F.3d 1148, 1152 (10th Cir. 2008) (internal quotation marks omitted). The "shaping or phrasing of a particular jury instruction," however, is reviewed only for abuse of discretion. *Id.*

The government contends that we need not address this issue because it had no obligation to prove a RICO enterprise in the first place; rather, all it had to show under § 1962(d) was that Defendants belonged to a *conspiracy* to associate with a RICO enterprise. We disagree. True, "§ 1962(d) does not require the Government to establish that an enterprise existed." *United States v. Harris*, 695 F.3d 1125, 1132 (10th Cir. 2012). But the jury still needed to be told what Defendants allegedly conspired to do. It had to find that Defendants "intend[ed] to further an endeavor which, *if completed*, would satisfy all of the elements of a substantive criminal offense," *Salinas v. United States*, 522 U.S. 52, 65 (1997) (emphasis added). In particular, the government had to prove that Defendants conspired to commit an offense with an interstate-commerce component, and the jury had to be instructed on the meaning of that component. We therefore must address Defendants' argument.

We have no binding precedent on the matter. As we said a decade ago, "Whether § 1962(c) should be interpreted to require a substantial effect on interstate commerce is an open question in this circuit." *United States v. Smith*, 413 F.3d 1253, 1274 (10th Cir. 2005), *overruled on other grounds by Boyle v. United States*, 556 U.S. 938, 948–49 (2009). Most other circuits, however, have held that RICO requires only a minimal effect on interstate commerce. *See United States v. Marino*, 277 F.3d 11, 34–35 (1st Cir. 2002);

*United States v. Miller*, 116 F.3d 641, 673–74 (2d Cir. 1997); *United States v. Cornell*, 780 F.3d 616, 621–23 (4th Cir. Mar. 16, 2015), *pet'n for cert. docketed*, No. 14-10267 (U.S. June 15, 2015); *United States v. Delgado*, 401 F.3d 290, 297 (5th Cir. 2005); *United States v. Riddle*, 249 F.3d 529, 537 (6th Cir. 2001); *United States v. Espinoza*, 52 F. App'x 846, 848–49 (7th Cir. 2002) (per curiam) (unpublished); *United States v. Shryock*, 342 F.3d 948, 984 & n.6 (9th Cir. 2003); *United States v. Beasley*, 72 F.3d 1518, 1526 (11th Cir. 1996); *cf. United States v. Maloney*, 71 F.3d 645, 663 (7th Cir. 1995) (minimal-effect jury instruction not plain error).

Defendants do not dispute the general rule but argue that it does not apply when there is no evidence that the enterprise engaged in economic activity and that "there was no evidence that the DVs . . . ever engaged directly in interstate commerce or economic activity." Garcia Aplt. Br. at 28. They rely on a decision by the Sixth Circuit and two district-court decisions from that circuit: *Waucaush v. United States*, 380 F.3d 251 (6th Cir. 2004); *United States v. Garcia*, 143 F. Supp. 2d 791 (E.D. Mich. 2000); and *United States v. Garcia*, 68 F. Supp. 2d 802 (E.D. Mich. 1999). Because the three decisions follow the same analysis, we need discuss only the circuit decision. In *Waucaush* federal prosecutors indicted a member of a street gang on RICO charges, alleging that he and his associates "murdered, conspired to murder, and . . . assaulted, with intent to murder, members of two rival gangs." 380 F.3d at 253. Seeking habeas relief, the defendant argued that he could not have violated RICO because his gang was not an enterprise that "'engaged in, or the activities of which affect[ed], interstate . . . commerce.'" *Id.* at 255

26

(quoting 18 U.S.C. § 1962(c)). The government did not assert that the gang *engaged* in any sort of commerce, so the only issue was whether the gang's *effect* on interstate commerce had to be substantial or merely minimal to sustain a RICO conviction. The court said that in most cases involving a Commerce Clause challenge to RICO, a minimal effect sufficed because the enterprise engaged in economic activity, such as trafficking in drugs, extorting money, or fencing stolen merchandise. The defendant's gang, however, participated only in "violence *qua* violence." *Id.* at 256. In that circumstance, said the court, the government was required to prove that the enterprise had a substantial effect on interstate commerce, and the gang's violence alone did not suffice. *See id.* at 258 ("The [gang's] violent enterprise surely affected interstate commerce in some way—a corpse cannot shop, after all. But we may not 'follow the but-for causal chain from the initial occurrence of violent crime . . . to every attenuated effect upon interstate commerce.'" (quoting *United States v. Morrison*, 529 U.S. 598, 615 (2000)). The court concluded that the defendant had not violated RICO.

That decision may be correct. *See Morrison*, 529 U.S. at 617 ("We . . . reject the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce."). But Defendants err in saying that *Waucaush* applies here because (according to them) their gang did not engage in economic activity. There was ample evidence that the Norteños' enterprise included drug trafficking, and drug trafficking is undoubtedly economic activity. *See, e.g., Shryock*, 342 F.3d at 984 n.6 ("drug trafficking and extortion[] are quintessential

27

illegal economic activities"). The evidence of drug trafficking included testimony from law enforcement that the gang trafficked in methamphetamine, cocaine, and marijuana, as well as testimony from gang members and their associates that the gang distributed drugs and was trying to accomplish "more drug selling; more profits." Ramirez R., Vol. III at 2258. And there was evidence that some of the trafficking was interstate in character: members of the gang sent money to California for drugs and sold drugs mailed from California. Because the Norteños engaged in economic activity, the factual predicate for Defendants' argument fails. They do not argue that the minimal-effect instruction was incorrect even if there was evidence that the Norteños engaged in economic activity.

## D. VICAR

Defendants next contest their VICAR convictions, focusing here as well on the statute's interstate-commerce requirement. The VICAR statute punishes violent crimes committed "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity." 18 U.S.C. § 1959(a). Similar to RICO, VICAR limits the definition of *enterprise* to a group "which is engaged in, or the activities of which affect, interstate or foreign commerce." *Id.* § 1959(b)(2). The indictment identified the Norteños gang as such an enterprise and Defendants' predicate VICAR offenses as various crimes under Kansas law, specifically, murder, assault with a dangerous weapon, and related attempt and conspiracy offenses.

Defendants raise an as-applied challenge to their VICAR convictions. Their argument is much the same as their argument against the RICO instruction: "Application

28

of VICAR to [Defendants], violated the Commerce Clause because the murder and other violent crimes had no effect on interstate commerce and were non-commercial in nature, and [were] unrelated to organized interstate trafficking efforts in drugs or other contraband." Garcia Aplt. Br. at 33. Our response is likewise similar. The factual predicate of the argument is incorrect. As previously discussed, the Norteños' enterprise did have a commercial component—namely, drug trafficking. We reject the VICAR challenge because it is based on a false factual premise.

## E.      The Gang Expert's Testimony

Defendants' final challenge is to the admission of several statements by the government's proffered gang expert, Shane Webb, who had focused on gang activity as an officer of the Dodge City Police Department. They argue that these statements involved no expertise at all, but rather were merely "parrot[ed]" testimonial hearsay in violation of their Confrontation Clause rights. *United States v. Kamahele*, 748 F.3d 984, 1000 (10th Cir. 2014). We review de novo a district court's legal conclusions regarding the Confrontation Clause. *See United States v. Torrez-Ortega*, 184 F.3d 1128, 1132 (10th Cir. 1999). The admission of evidence barred by the Confrontation Clause requires reversal of the conviction unless the admission was harmless beyond a reasonable doubt. *See United States v. Summers*, 414 F.3d 1287, 1303 (10th Cir. 2005).

### 1.      Gang-Expert Testimony and the Confrontation Clause

The Sixth Amendment's Confrontation Clause guarantees the right of the accused "to be confronted with the witnesses against him." U.S. Const. amend. VI. It bars

29

"admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004). Testimonial statements include "those in which state actors are involved in a formal, out-of-court interrogation of a witness to obtain evidence for trial." *Michigan v. Bryant*, 131 S. Ct. 1143, 1155 (2011). The statements may or may not be hearsay excluded under Federal Rule of Evidence 802. *See Crawford*, 541 U.S. at 51.

Special considerations arise under the Confrontation Clause in the context of expert testimony. Federal Rule of Evidence 703 allows an expert to "base an opinion on facts or data in the case that the expert has been made aware of or personally observed"; and "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, *they need not be admissible for the opinion to be admitted*" (emphasis added). In particular, the rule could allow an expert to rely on testimonial hearsay. Of course, Rule 703 cannot override the Confrontation Clause, but we have held that the Rule and the Clause can be reconciled if the expert exercises "independent judgment" in assessing and using the hearsay (and other sources) to reach an expert opinion. *Kamahele*, 748 F.3d at 1000; *see also United States v. Pablo*, 696 F.3d 1280, 1288 (10th Cir. 2012). As the Fourth Circuit reasoned: "As long as [an expert] is applying his training and experience to the sources before him and reaching an independent judgment, there will typically be no *Crawford* problem. The expert's

30

opinion will be an original product that can be tested through cross-examination." *United States v. Johnson*, 587 F.3d 625, 635 (4th Cir. 2009).

The independent-judgment requirement under the Confrontation Clause will generally be satisfied if the testimony by the expert satisfies the Rule 702 requirement that the expert testimony assist the jury because of the value of the witness's expertise. *See Williams v. Illinois*, 132 S. Ct. 2221, 2241 (2012) (plurality opinion) ("[T]rial courts can screen out experts who would act as mere conduits for hearsay by strictly enforcing the requirement that experts display some genuine 'scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue.'" (quoting Fed. R. Evid. 702(a))). On the other hand, if "[t]he jury [is] every bit as qualified to analyze" a piece of mundane evidence as the purported expert, the expert provides no added value on which to be cross-examined. *United States v. Benson*, 941 F.2d 598, 605 (7th Cir. 1991) (expert "had nothing to offer on this question that would assist the jury's understanding of the issue"), *mandate recalled and amended*, 957 F.2d 301 (7th Cir. 1992).

In this case we apply the above analysis to testimony by a gang expert. We have long recognized the usefulness of such testimony "because the average juror is often innocent of the ways of the criminal underworld." *United States v. Vann*, 776 F.3d 746, 758 (10th Cir. 2015) (brackets and internal quotation marks omitted). Expert testimony about a gang's history, territory, colors, hand signs, graffiti use, naming practice, tattoos, structure, membership rules, and similar sociological evidence can assist the jury in

31

understanding and evaluating evidence concerning the specific crimes charged. *See United States v. Archuleta*, 737 F.3d 1287, 1294–95 (10th Cir. 2013); *United States v. Robinson*, 978 F.2d 1554, 1561–63 (10th Cir. 1992); *United States v. Hartsfield*, 976 F.2d 1349, 1352 (10th Cir. 1992); *United States v. Mejia*, 545 F.3d 179, 187 (2d Cir. 2008). But there is no sociological expertise in testifying to gang members' specific travels, specific uses of gang funds, or commission of specific crimes. *See Mejia*, 545 F.3d at 194–95; *see also Benson*, 941 F.2d at 605 (admission of IRS agent's testimony an abuse of discretion when "[t]here was no complex transaction that had to be broken down so the jury could understand it, no tax law concept or accounting principle to explain"). When the expert's testimony on such matters is not based on personal knowledge but on testimonial hearsay, the testimony violates not only the rules of evidence but also the Confrontation Clause. We have repeatedly cautioned about the impropriety of permitting an "expert" witness to "parrot[]" testimonial hearsay. *Kamahele*, 748 F.3d at 1000. As we said in *Pablo*, "If an expert simply parrots another individual's out-of-court statement, rather than conveying an independent judgment that only incidentally discloses the statement to assist the jury in evaluating the expert's opinion, then the expert is, in effect, disclosing that out-of-court statement for its substantive truth; the expert thereby becomes little more than a backdoor conduit for an otherwise inadmissible statement." 696 F.3d at 1288; *see United States v. Garcia*, 752 F.3d 382, 394 (4th Cir. 2004) (expert not permitted to "channel[]" statements from nontestifying witnesses).

An important consideration in distinguishing proper testimony from parroting is the generality or specificity of the expert testimony. As stated in *Mejia*, when gang-expert testimony descends to a discussion of specific events recounted by others, the expert is merely adding "unmerited credibility" to the sources, 545 F.3d at 192 (internal quotation marks omitted), and summarizing evidence in a way that should be reserved for the government's closing argument. The court explained:

> If the officer expert strays beyond the bounds of appropriately "expert" matters, that officer becomes, rather than a sociologist describing the inner workings of a closed community, a chronicler of the recent past whose pronouncements on elements of the charged offense serve as shortcuts to proving guilt. As the officer's purported expertise narrows from "organized crime" to "this particular gang," from the meaning of "capo" to the criminality of the defendant, the officer's testimony becomes more central to the case, more corroborative of the fact witnesses, and thus more like a summary of the facts than an aide in understanding them.

*Id.* at 190. When an expert's bailiwick is only "internal expertise" of the investigation at hand and the expert does no more than "disgorge . . . factual knowledge to the jury," the expert is "no longer aiding the jury in its factfinding [but is] instructing the jury on the existence of the facts needed to satisfy the elements of the charged offense." *Id.* at 191; *cf. United States v. Dukagjini*, 326 F.3d 45, 59 (2d Cir. 2003) (pre-*Crawford* opinion holding that expert testimony violated Confrontation Clause when gang expert "was not translating drug jargon, applying expert methodology, or relying on his general experience in law enforcement," but rather "was relying on his conversations with non-testifying witnesses and co-defendants"). Such a witness cannot be distinguished from

33

any other witness conveying hearsay, and the parroting by the "expert" may violate the Confrontation Clause.

## 2.    The Gang Expert's Statements

These principles in hand, we turn to the facts of this case.  The government called Webb as its first witness at trial.  Defendants take issue with five of his statements.[1]

### a.    Statement One

Webb testified about the DV's home-invasion robberies of Guatemalan immigrants.  He was asked, "And is there anything about the stature of Guatemalans that, according to DV gang members, make them an attractive target?"  Ramirez R., Vol. III at 982.  He replied, "Yes.  I've been told that they are small.  They're also scared about their immigration status and . . . they're afraid if they call law enforcement that they will be deported."  *Id.*  Defendants contend that admission of the answer was error.

The hearsay is readily apparent from the exchange.  Webb was asked for his opinion about whether Guatemalans' stature makes them attractive targets "*according to DV gang members*."  *Id.* (emphasis added).  His answer relayed at least one out-of-court statement:  "I've *been told* that they are small."  *Id.* (emphasis added).  And that

---

[1] Defendants identify eight allegedly problematic statements in their briefing, but at trial they objected on Confrontation Clause grounds to only five of them.  On appeal they do not argue that the admission of the other three statements was plain error, so we will not review them.  *See United States v. McGehee*, 672 F.3d 860, 873 (10th Cir. 2012) ("[W]here a defendant has forfeited an issue in the district court, in order to prevail in an appellate challenge regarding that issue, a defendant must make a sufficient showing of error under the plain-error standard.").

statement was offered for its truth (not that Guatemalans are small, but why DV gang members target them). Webb indicated that the source of his information was investigative interviews, and the government has not suggested that the hearsay he relied on was other than testimonial. *See Bryant*, 131 S. Ct. at 1155 (statements gathered from "formal, out-of-court interrogation of a witness to obtain evidence for trial" are testimonial).

The government cannot plausibly argue that Webb applied his expertise to this statement. It involves no interpretation of gang culture or iconography, no deciphering of coded messages, no calibrated judgment based on years of experience and the synthesis of multiple sources of information. He simply relayed what DV gang members told him. Admission of the testimony violated the Confrontation Clause.

Still, we must decide whether in light of the whole record Webb's testimony was harmless beyond a reasonable doubt. Factors for determining harmless error include "the importance of the witness'[s] . . . testimony in the prosecution's case, the cumulative nature of the testimony, the presence or absence of corroborating or contradictory testimony, the extent of cross-examination otherwise permitted, and the overall strength of the prosecution's case." *Summers*, 414 F.3d at 1303 (internal quotation marks omitted).

We conclude that the testimony was harmless. The "expert opinion" that DV members targeted Guatemalans added little to the other evidence on the matter. Jesus Flores and the victims gave first-hand testimony that Defendants participated in a home-

invasion robbery of Guatemalans. DV member Galindo testified that he and other gang members were involved in about 20 robberies of Guatemalan immigrants, whom they targeted because they would hold their money in cash rather than deposit it in banks. And Webb testified at length without objection (at trial or on appeal) that Norteño-affiliated gangs committed home-invasion robberies of Guatemalan immigrants.

### b.        Statement Two

Webb was next asked: "And do you have experience, Agent Webb, where Guatemalan immigrants have been the victims of these robberies and lost sizable amounts of money, currency?" Ramirez R., Vol. III at 982. He answered, "Yes." *Id.* This testimony, too, is presumably based upon testimonial-hearsay statements of DV members and Guatemalan victims to the police. *Cf. Mejia*, 545 F.3d at 194–95 (no expertise needed to testify to compilation of crimes allegedly committed by gang). Nevertheless, it was harmless for the same reason that admission of the previous statement was harmless.

### c.        Statement Three

Webb testified about Defendants' "status," meaning seniority or respect, in the DV gang:

> Q. . . . [D]o you know Pedro Garcia and Gonzalo Ramirez to be people, gang members, that were considered to have status within the DV gang?
> A. Yes.
> Q. . . . Tell us how you know that.
> A. Through debriefing other gang members that have cooperated with us.

Ramirez R., Vol. III at 989. This testimony is quintessential parroting.

36

But Webb's statement about Defendants' status was harmless. At trial, Worthey agreed that Defendants "had a great deal of status," *id.* at 1481, to the point of "the ultimate respect," *id.* at 1493. Wright testified that Defendants were the type of gang members who "ha[d] heart," meaning they would go with him if he was going to fight or do something of that nature, *id.* at 1256, and that gave Defendants "status," *id.* at 1257. Torres testified that Garcia received more respect than other gang members, that Ramirez was viewed the same way, and that Ramirez's "status within the gang" was one of respect. *Id.* at 2102. Given this testimony from fellow gang members, we are convinced that Webb's reference to Defendants' status was harmless.[2]

### d.        Statement Four

Webb testified that DV gang members had told him that they were "jumped in," meaning physically assaulted, as their initiation into the gang. *Id.* at 1007. This evidence, too, was harmless. The statement does little to inculpate Defendants in any meaningful way. And several gang members testified about their own and others' jump-ins. The testimony was so cumulative that by the third day of testimony the court instructed the government to move more quickly when questioning witnesses about jump-ins. Webb's testimony on jump-ins did not contribute to the guilty verdicts.

---

[2] It may be that Webb's testimony about status was based solely on what he was told by persons who testified at trial. Because the trial witnesses were subject to cross-examination, the use of their hearsay statements would not violate the Confrontation Clause. *See Crawford*, 541 U.S. at 59 n.9 ("[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements.").

### e. Statement Five

Finally, Webb testified about a ledger that recorded payments made by gang members at gang meetings. He was asked: "And you know this was a gang roster and . . . this was a ledger of monies being paid for meetings attended, you know that how?" *Id.* at 1012. He replied: "From two—debriefing of two different individuals that described that." *Id.* This is parroting. There is no application of experience or judgment; Webb simply repeated in court what two persons had told him about the ledger. Even so, the statement was harmless. The apparent point of this testimony was to demonstrate that there were "rosters of DV gang members and proof that there [were] meetings being held by the DV." *Id.* But the jury also heard about the DV enterprise from no fewer than seven self-avowed gang members. And Worthey provided far more detail about the ledger, testifying that the DV gang held meetings and that at those meetings the members made monthly payments toward the gang, which he recorded in the ledger; another gang member, Juan Torres, corroborated this testimony. Webb's statement about the ledger, like his other contested statements, was harmless.

## III. CONCLUSION

We AFFIRM the judgment of the district court.