Filed 3/23/26  P. v. Gonzalez CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>CARLOS ALEXANDER GONZALEZ,<br><br>    Defendant and Appellant. | G064060<br><br>(Super. Ct. No. 18CF1661)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Patrick H. Donahue, Judge. Affirmed and remanded as directed.

Sandra Gillies, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Melissa Mandel and Seth M. Friedman, Deputy Attorneys General, for Plaintiff and Respondent.

\*        \*        \*

A jury convicted defendant Carlos Alexander Gonzalez (Defendant) of first degree murder. At trial, he admitted to killing the victim (Victim) but claimed it was not planned. He testified that Victim had sexually assaulted his girlfriend, Jolene L., two months before the killing. The night of the killing, Jolene L. ran into Victim at a convenience store, became distraught, and then informed Defendant that she had seen Victim. Defendant testified that he unexpectedly saw Victim later that night and killed him in a fit of rage.

During voir dire, Defendant stated that he might call Jolene L. as a witness to corroborate his account of the night of the killing. The trial court appointed Jolene L. counsel to determine whether her potential testimony might implicate her Fifth Amendment privilege against self-incrimination (the privilege). After a discussion with her court-appointed counsel, Jolene L. asserted the privilege, which the court accepted without question.

On appeal, Defendant primarily argues that the trial court erred by failing to conduct a particularized inquiry into Jolene L.'s assertion of the privilege. We disagree. Defendant wanted to question Jolene L. about her actions on the night of the murder. Based on the information the court had at the time, it was evident that her responses to this line of questioning "'might be dangerous because injurious disclosure could result.'" (*People v. Cudjo* (1993) 6 Cal.4th 585, 617.) Thus, the court did not err by allowing Jolene L. to invoke the privilege.

Defendant also argues that the trial court abused its discretion by denying his request to continue the sentencing hearing. We find no error. While Defendant wanted to gather more evidence, he did not explain how such evidence would impact sentencing. Defendant also claimed he needed more time to prepare a new trial motion. But he had already been allowed

2

four months to prepare one. Further, he was unsure of the basis for this purported motion, nor could he estimate when the motion would be ready.

The trial court's judgment is affirmed and remanded as directed.

FACTS AND PROCEDURAL HISTORY

I.

SENTENCE

A jury found Defendant guilty of first degree murder (Pen. Code, § 187, subd. (a)),[1] and shooting at an occupied motor vehicle (§ 246). It also found true that he personally used a firearm in the commission of both offenses (§ 12022.53, subd. (d)).

The trial court sentenced Defendant to a total term of 50 years to life in prison, comprised of 25 years to life for the murder charge plus a consecutive term of 25 years to life on the accompanying firearm enhancement. As to Defendant's conviction for shooting at an occupied motor vehicle, the court imposed a determinate sentence of three years plus 25 years to life for the related firearm enhancement, and ordered these terms to run concurrent to his murder sentence.

II.

EVIDENCE AT TRIAL

A.  *Defendant and Victim's Relationship*

Defendant and Victim were former friends. They used to hang out together, sometimes with Jolene L., who had been in an on-and-off relationship with Defendant since they were in middle school.

---

[1] All further undesignated statutory references are to the Penal Code.

3

One night in March 2018, Victim and Jolene L. were drinking and smoking with a group of friends at a park. Defendant was not there, and it appears that he and Jolene L. were on a break from their relationship at the time. Witnesses testified that Jolene L. was flirting with some of the males in the group, including Victim. She and Victim kissed and then began making out in the backseat of a friend's car. That friend dropped off Jolene L. and Victim near an apartment complex and drove off.

It is unclear what happened that night between Jolene L. and Victim after their friend dropped them off. But Defendant believed that Victim had taken advantage of Jolene L. and raped her. There was testimony at trial that Defendant told his friends that he hated Victim and wanted to "retaliate" against and kill Victim.

B. *The Stabbing*

On the night of April 7, 2018, Victim was drinking and smoking in a parking lot in front of Taqueria Zamora in Santa Ana with some friends. Victim wanted Defendant to join them, so he and a friend drove to pick up Defendant. On the drive back to the parking lot, Victim asked Defendant for some pills. Defendant offered Victim three pills that a witness believed to be Xanax bars. Victim took all three. Eventually, around 2:00 or 3:00 a.m., everyone in the group had left except for Defendant and Victim.

Victim arrived at his father's house in Santa Ana the next day around 7:00 a.m. Victim looked like he had "gotten beat up." He had a bruise on his eye, his mouth and lips were swollen, he was missing a fingernail and had lacerations to his eye, the back of his ear, and two on his back. The lacerations on his back looked like knife punctures.

Victim told his father that Defendant had beaten him up. However, Victim indicated that he did not want to identify Defendant as his attacker because he was afraid of retaliation.

After the stabbing, Defendant sent messages to Victim and other people calling Victim "a rapist" and accusing him of trying to digitally penetrate Jolene L. while she was sleeping.

## C. The Shooting

Around midnight on May 19, 2018, Victim and a friend went to buy beer at an AM/PM market. They ran into Jolene L. and her friend while they were exiting the store. A witness testified that Jolene L. responded negatively to Victim and his friend and aggressively said "'what?'" to them. The same witness stated that after the encounter Jolene L. "looked confused, scared . . . she was just in shock."

Victim and his friend then drove in Victim's car to the Taqueria Zamora parking lot. They drank and smoked while sitting in the car. Taqueria Zamora's parking lot was across the street from the Adagio Apartments (Adagio). A friend of Victim testified that Victim and his friends "would always be around that area."

Meanwhile, Defendant testified that one of his friends told him that Jolene L. had run into Victim and "really need[ed] [him] right now." Defendant explained that his friend arranged for an Uber to take Defendant to meet Jolene L. at about 1:00 a.m. in a parking lot near Adagio.

Defendant and Jolene L. then walked to Adagio to get some privacy. Defendant testified that Jolene L. was "real quiet" at first. But once they got inside Adagio, "she [broke] down and start[ed] to cry." He attempted to ask her questions, but she was crying too much, and he could not get any answers from her. Eventually, however, Defendant stated that Jolene L.

5

disclosed that she ran into Victim. She "looked like a wreck." Defendant felt "[v]ery anxious, furious, depressed."

Gina A. is a friend of Jolene L. She lived with Jolene L. and her mother, Leticia L. Gina A. was at home when she received a text message from Jolene L. at 3:13 a.m. Jolene L. asked to be picked up from Adagio, which was about 10 to 12 minutes away. Gina A. then drove with Leticia L. to Adagio.

Around this time, a witness saw a male in the Adagio parking lot wearing dark colored clothing and a mask or beanie covering his face. The individual then crossed the street towards Taqueria Zamora. At 3:24 a.m., surveillance cameras from an alleyway that wraps around Taqueria Zamora captured an individual dressed in black who was armed with a gun. The individual was wearing gloves and had his face covered. Defendant admitted at trial that he was the person in this surveillance footage.

Shortly before 3:39 a.m., Defendant approached the driver's side of Victim's car, where Victim was sitting, and started shooting. Victim's friend heard Defendant scream "'f*ck [Victim's nickname]' or 'f*ck' something." After the shooting stopped, Victim's friend had to search the car for his mobile phone and then called 911 at 3:39 a.m. Victim suffered four gunshot wounds and died.

D. *Events After the Shooting*

After the shooting, Defendant ran across the street to the Adagio parking lot. A witness testified that he appeared to be looking for someone. About a minute or two later, Gina A. and Leticia L. arrived at the Adagio parking lot. Leticia L. exited the vehicle. Before she exited, she told Gina A. to meet her at the home of Jolene L.'s father. A witness saw Defendant "jump" in the backseat of the car, and he and Gina A. "sped out of the parking

6

lot." Gina A. drove to the home of Jolene L.'s father, which was not far from Adagio. Gina A. hid the jacket that Defendant had been wearing, and Defendant got rid of his gloves. Neither Leticia L. nor Jolene L. were at the home.

Gina A. and Defendant then drove to Leticia L.'s home, where they met Jolene L. and Leticia L. From there, Defendant, Jolene L., Leticia L. and Gina A. went to the home of one of Leticia L.'s friends. Defendant still had the gun from the shooting. There was testimony that while they were at the friend's home, Defendant told Gina A. he had shot the person "who messed with Jolene [L]." Gina A. also remembered Defendant saying that "the gun had to go back to his boys." At trial, Gina A. could not remember the context of this statement. However, when interviewed by police in 2018, Gina A. explained that Defendant had made this statement during a conversation with Leticia L. about getting rid of the gun.

E. *The Defense's Case*

1. *Defendant's Testimony*

Defendant testified that Jolene L. had told him in March 2018 that she had gotten "very intoxicated and that someone sexually assaulted her and [was] trying to rape her." She could not remember the person's identity, but he later learned that Victim was the alleged offender.

Defendant admitted to both stabbing Victim with a box cutter on April 7, 2018, and then fatally shooting him on May 19, 2018.

As to the stabbing, Defendant claimed that Victim had told him on April 7, 2018, that he had penetrated Jolene L. with his hands while she was sleeping. Defendant became enraged and started choking Victim. Victim fought back. Defendant testified that he stabbed Victim with a box cutter and smashed his face into the ground in self-defense.

7

Defendant also conceded shooting Victim but testified that it was not planned. He explained that he carried a gun nearly every day for protection because he bought and sold drugs. Prior to meeting Jolene L. the night of May 19, 2018, he had drunk two 32-ounce beers and taken some Xanax. After talking to Jolene L. at Adagio, he was upset. The two parted ways so he could clear his head.

After they separated, Defendant testified that he began looking for unlocked cars to burglarize in the Adagio parking lot, which is why he covered his face. He could not find any unlocked cars there, so he crossed the street to the Taqueria Zamora parking lot to check more cars. He claimed to have walked through the alley with the surveillance cameras because he was trying to access a back parking lot.

Defendant claimed that while he was looking for cars to burglarize at Taqueria Zamora, he saw Victim's car, which he immediately recognized. He "was blinded by rage." He walked up the car, said "'what the f*ck,'" and then fired his gun. Defendant explained, "I just had a lot of hate in my heart, and I felt like [Victim] was trying to hurt my family and I just -- I thought I did the right thing."

After the shooting, he ran back across the street toward Adagio. He saw Gina A. sitting in a car and dove into it because he did not know what else to do. He admitted to trying to conceal the crime by throwing away his gloves and shirt and having Gina A. dispose of his jacket.

2. *Jolene L. invokes the privilege*

During voir dire, outside the presence of the prospective jurors, defense counsel stated that if Defendant chose to testify at trial, he might call Jolene L. to corroborate Defendant's account of the shooting. Defense counsel continued, "if the court determines that she has a 5th Amendment issue and

8

then she is appointed counsel, and after her discussions with counsel decides that she doesn't want to testify, [Defendant] could be left with a critical witness being unable to tell her side of the story to the jury. And that's critical information that may help to bolster [Defendant's] credibility." Defendant's credibility was significant "if we are dealing with degrees of homicide, whether this is a first degree murder or second degree murder or manslaughter, or not."

Defense counsel then argued that Jolene L. had no valid reason to assert the privilege. Based on the police and defense investigations, she might be guilty of an accessory charge (§ 32) along with Leticia L. and Gina A. for arranging a getaway car for Defendant.[2] But the statute of limitations for such a charge had already run. Further, defense counsel claimed "[t]here [was] no evidence that [Jolene L. was] involved in the actual killing or that she actually directly aided and abetted in this killing."

The trial court then appointed Jolene L. counsel. It explained, "I am doing this out of an abundance of caution . . . . We are not exactly sure what she is going to say, and I just want someone to talk to her and say here is perhaps something that -- you know, maybe there is nothing. The lawyer will say there is absolutely nothing to discuss. I don't know. But I just want to have that conversation before she takes the stand."

The prosecution agreed with the appointment of counsel. The prosecutor stated, "I don't know if there is a 5th Amendment issue or not. But

---

[2] "Every person who, after a felony has been committed, harbors, conceals or aids a principal in such felony, with the intent that said principal may avoid or escape from arrest, trial, conviction or punishment, having knowledge that said principal has committed such felony or has been charged with such felony or convicted thereof, is an accessory to such felony." (§ 32.)

I do know that when she was previously interviewed by police with regard to this case, she did invoke [it]. [¶] She has already indicated that she didn't want to speak about these things based on whatever reasons she might have. And so that raises a concern with me that she might do that on the stand. And so I think it is better if we get that resolved beforehand."

Jolene L. and her appointed counsel appeared the next day of trial. Jolene L.'s counsel informed the trial court, "Jolene [L.] does not want to testify. I have advised her not to because her 5th Amendment rights are implicated, based on our conversation." The court then asked, "So you believe that there is a 5th Amendment issue on it?" Jolene L.'s counsel replied, "I do, your Honor. And she would like to invoke."

The trial court accepted Jolene L.'s assertion of the privilege. But it informed the parties that her on-call subpoena would remain in effect "[o]ut of an abundance of caution." Jolene L.'s counsel would be contacted "if there [was] any chance later in the trial that [Jolene L.] would potentially testify."

Defense counsel then repeated his belief that there was no Fifth Amendment issue for Jolene L. because the evidence only indicated she could be charged as an accessory. "And everybody here agrees that the statue on [an accessory charge] . . . has run." Further, nothing in the police reports or the defense investigation indicated "that [Jolene L.] was an aider and abettor to a homicide in this case."

The trial court agreed that the statute of limitations had run on an accessory charge. But it noted "that there is just a period of time where, about three hours before . . . the alleged murder in this matter, Jolene [L.] was seen at an AM/PM mini mart or something like that." "[M]y concern was just the time frame involved in there . . . your direct might not address some of those time issues. But on cross-examination I can see where, potentially,

10

she might be cross-examined and say questions like, 'where were you after you saw the people in the AM/PM mini market? Did you ask questions? Did you . . . call [Defendant] and say, "I saw these people together"? How did you know to direct people to the scene?' [¶] And those type of questions I just had concerns with. And that would have been on cross. So that's the reason why I had [Jolene L.'s counsel] come over."

III.

THE APPEAL

Defendant appeals his first degree murder conviction and sentence. As to his conviction, he argues the trial court failed to conduct a particularized inquiry into whether Jolene L.'s invocation of the privilege was valid. He likewise argues that the prosecution interfered with his right to present a defense by urging the court to appoint Jolene L. counsel. As to his sentence, he asserts the court abused its discretion by failing to consider his request to continue the sentencing hearing.

DISCUSSION

I.

THE FIFTH AMENDMENT

A. *Particularized Inquiry*

    1. *Applicable law*

Under the Sixth Amendment, criminal defendants have the right "'to have compulsory process for obtaining witnesses in his favor.'" (*In re Martin* (1987) 44 Cal.3d 1, 29.) But this right does "not entitle the defendant to compel a witness to waive his Fifth Amendment privilege" against self-

11

incrimination (the privilege).[3] (*People v. Woods* (2004) 120 Cal.App.4th 929, 938.) "'It is a bedrock principle of American (and California) law . . . that witnesses may not be compelled to incriminate themselves. [T]his privilege "must be accorded liberal construction in favor of the right it was intended to secure."'" (*People v. Trujeque* (2015) 61 Cal.4th 227, 267.)

"A witness may assert the privilege who has 'reasonable cause to apprehend danger from a direct answer.'" (*People v. Seijas* (2005) 36 Cal.4th 291, 304–305.) The "witness need not be guilty of any offense; rather, the privilege is properly invoked whenever the witness's answers 'would furnish a link in the chain of evidence needed to prosecute' the witness for a criminal offense. [Citations.] To satisfy this standard, 'it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered *might be dangerous* because injurious disclosure could result.' [Citation.] [O]ur Evidence Code provides that when a witness grounds a refusal to testify on the privilege against self-incrimination, a trial court may compel the witness to answer only if it '*clearly appears to the court*' that the proposed testimony 'cannot possibly have a tendency to incriminate the person claiming the privilege.'" (*People v. Cudjo* (1993) 6 Cal.4th 585, 617, italics added.)

Generally, a witness may not make a blanket assertion of the privilege. "A witness's 'say-so does not itself establish the hazard of incrimination. It is for the court to say whether his silence is justified . . . .' [Citation.] In other words, a trial court 'must make "a particularized inquiry,

---

[3] "No person . . . shall be compelled in any criminal case to be a witness against himself." (U.S. Const., 5th Amend.)

deciding, in connection with each specific area that the questioning party wishes to explore, whether or not the privilege is well-founded." [Citation.] Although the witness may have a valid claim to the privilege with respect to some questions, the scope of that privilege may not extend to all relevant questions. The witness may be totally excused only if the court finds that he could "legitimately refuse to answer essentially all relevant questions." [Citation.]' [Citation.] This has long been the rule in California in both criminal and civil proceedings." (*People v. Trujeque*, *supra*, 61 Cal.4th at pp. 267–268.)

We review the trial court's ruling de novo. (*People v. Seijas*, *supra*, 36 Cal.4th at p. 304.)

2. *Analysis*

Defendant contends the trial court erred by relying on a blanket assertion of the privilege by Jolene L.'s counsel instead of conducting a particularized inquiry into whether the privilege applied. Defendant also claims the court improperly speculated as to whether Jolene L. might be liable for the murder under an aiding and abetting or conspiracy theory because there was little evidence to support either charge.

To begin, we disagree that the trial court allowed Jolene L. to make a blanket assertion of the privilege. Rather, it granted the privilege as to a specific area of questioning. The record indicates that Defendant wanted to call Jolene L. as a witness to corroborate his story of the events on May 19, 2018. Thus, the court granted Jolene L. the privilege as this limited scope, i.e., to questions concerning Jolene L.'s actions the night of the killing. Significantly, the court did not completely bar Jolene L. from testifying. It let the witness subpoena remain for her in case the defense sought to call her during trial. (See, e.g., *People v. Brooks* (2024) 99 Cal.App.5th 323, 334 [a

13

witness's assertion of the privilege to a line of questions "about her potentially assaultive behavior" was not a blanket assertion of the privilege].)

To the extent Defendant sought to have Jolene L. take the stand and "invoke the privilege on a question-by-question basis," "defense counsel—not the trial court—[bore] responsibility for failing to insist that [Jolene L.] invoke the privilege in a particular manner." (*People v. Brooks*, *supra*, 99 Cal.App.5th at p. 335.)

We also note that Defendant did not express below any intent to question Jolene L. about any topics aside from her actions after encountering Victim the night of the killing. Nor does he do so in this appeal. Rather, Defendant argues that Jolene L. "was the only person who could corroborate [Defendant's] testimony about how the nature of the encounter between Jolene [L.] and [Victim] in the AM/PM and her reaction to it affected his mental state, which was the only issue for the jury."

Next, the trial court did not err by allowing Jolene L. to assert the privilege as to this area of questioning. About three hours passed between the time Jolene L. ran into Victim at AM/PM and his murder. As the court discussed, Jolene L. could have been asked what she and Defendant discussed during this timeframe, if she knew Victim was in the Taqueria Zamora parking lot, whether she directed Defendant to go there, and how she seemingly knew to direct Gina A. to the Adagio to pick up Defendant right after the shooting occurred.

Jolene L.'s responses to the above questions (or other similar questions) "'*might* [have been] dangerous because injurious disclosure could [have] result[ed].'" (*People v. Cudjo*, *supra*, 6 Cal.4th at p. 617, italics added.) Her responses may have exposed her to liability beyond an accessory charge.

14

For example, they may have "'furnish[ed] a link in the chain of evidence needed to prosecute'" Jolene L. for conspiracy to commit murder.[4] (See *Ibid*.)

We are also unpersuaded by Defendant's argument that nothing in the record shows that Jolene L. could be liable for murder under an aiding and abetting or a conspiracy theory. The absence of such evidence in the record does not mean that Jolene L. could not have provided testimony exposing her to liability for such charges. Indeed, the record indicates Jolene L. invoked the privilege when questioned by the police. Thus, it could be reasonably inferred that there was no such evidence in the record because Jolene L. exercised the privilege during the police investigation, and Defendant's account of his interactions with Jolene L. were inaccurate.

B. *Prosecutorial Interference*

Next, Defendant contends the prosecution interfered with his right to present a defense by urging the trial court to appoint Jolene L. counsel. Defendant suggests that this action "conveyed to [Jolene L.] the danger of providing any corroboration of [Defendant's] account" and discouraged her from testifying. The prosecution's conduct was not improper.

The prosecution "'cannot substantially interfere with a defense witness's decision to testify.'" (*United States v. Pablo* (10th Cir. 2012) 696 F.3d 1280, 1295–1296.) To prove prosecutorial interference, Defendant must show (1) "'conduct that was "entirely unnecessary to the proper performance

---

[4] The crime of conspiracy "has four elements: (1) the existence of an agreement between at least two persons; (2) the specific intent to agree to commit an offense; (3) the specific intent to commit the offense that is the object of the agreement; and (4) an overt act in furtherance of the conspiracy, which may be committed by any conspirator." (*People v. Ware* (2022) 14 Cal.5th 151, 163.)

of the prosecutor's duties and was of such a nature as to transform a defense witness willing to testify into one unwilling to testify"'"; (2) "the prosecutor's misconduct was a substantial cause in depriving the defendant of the witness's testimony"; and (3) "the testimony he was unable to present was material to his defense." (*People v. Lucas* (1995) 12 Cal.4th 415, 457.)

Defendant has not established either the first or second prong of the above test. Based on the record, Defendant initially raised the idea of appointing Jolene L. counsel. Defense counsel explained the Jolene L. was a potential witness that could corroborate Defendant's account on the night of the killing. Defense counsel then stated, "if the court determines that she has a 5th Amendment issue and then she is appointed counsel, and after her discussions with counsel decides that she doesn't want to testify, [Defendant] could be left with a critical witness being unable to tell her side of the story to the jury."

After defense counsel had set forth his position, the trial court stated its intent to appoint Jolene L. counsel out of an abundance of caution. The prosecution then agreed with the court's assessment. The prosecution did not take any independent action to discourage Jolene L. from testifying, and its agreement with the court's ruling cannot reasonably be construed as misconduct.

Defendant also argues that the prosecution discouraged Jolene L. from testifying by seeking counsel for her but not for Gina A., who also faced potential accessory liability. But, as explained above, Jolene L. and Gina A. were not similarly situated. Jolene L.'s testimony could have potentially subjected her to criminal liability beyond an accessory charge. Thus, there was good reason for the prosecution to support the appointment of counsel for Jolene L. but not Gina A.

16

## II.

### CONTINUANCE OF SENTENCING

*A. Background*

Defendant was represented by the alternate public defender's office during trial. Following his conviction on October 18, 2023, Defendant moved to represent himself. A hearing was held on December 15, 2023. Before ruling, the trial court cautioned Defendant that he would get no special treatment from the court and would be required "to follow all the technical rules of law and procedure and evidence." It also stated, "I want to make sure you are clear that we will do the sentencing on January 19th." Defendant said he understood. The court then reiterated, "And I am going to hold you to that." Defendant responded, "Yes, sir. You have got my word." The court then granted Defendant's request to represent himself.

The parties appeared again on January 9, 2024. The trial court stated that it had not ordered a probation and sentencing report. It continued the sentencing hearing to February 23, 2024, so the report could be prepared. At the January 9 hearing, Defendant explained that he was still waiting for his prior counsel to give him the rest of the police reports. The court stated that it would facilitate that process.

On February 2, 2024, the trial court held a hearing with defendant, his former counsel, and the prosecution. The hearing was intended "to make sure [Defendant] ha[d] everything because [the court] want[ed] to go forward with the sentencing on February 23rd."

Defendant claimed he was still missing some documents, including pages of police reports and transcripts from body camera footage. The court explained it had not heard of body camera transcripts, and the prosecution stated that such transcripts were not typically made unless a

17

party intended to introduce them at trial, which had not been done here. Defendant insisted that he needed them. So, the court explained that he would likely need to submit a request or hire an investigator to obtain them.

The prosecution also reported that it had provided Defendant with all the police reports. Former defense counsel likewise stated that he had given Defendant "all the police reports that he would need to understand what the case is, to understand what the evidence is, to have meaningful conversations with his attorney about trial strategy, about the strengths and weaknesses of his case." Former defense counsel opined that any missing pages likely contained immaterial information or were duplicates.

At the sentencing hearing on February 23, 2024, the trial court noted that it had received a letter that morning from Defendant.[5] In the letter, Defendant requested a continuance of the sentencing hearing so he could obtain (1) a psychiatric review because he had purportedly suffered a mental breakdown and had hallucinations weeks prior to the killing, (2) more files from his former counsel, and (3) evidence to support a Racial Justice Act claim.

After the trial court mentioned the letter, Defendant explained that he had been appointed an investigator on February 16, 2024, who was looking into mitigating factors relevant to a *Franklin* proceeding.[6] He also

---

[5] The Defendant's letter was received by the trial court on February 23, 2024, but is dated February 14, 2024, and postmarked February 21, 2024.

[6] "Broadly speaking, a *Franklin* proceeding allows youth offenders sentenced to long prison terms an opportunity to introduce into the record mitigating evidence relating to their youth." (*People v. Howard* (2021) 74 Cal.App.5th 141, 145.)

18

stated that he had spoken to an attorney on February 13, 2024, about filing a new trial motion, and she had advised him to ask for a continuance.

The prosecution contested the continuance request. It argued that Racial Justice Act issues could be raised after sentencing and Defendant had not explained how any mental health issues prior to the commission of the crime were relevant to sentencing.

The trial court reminded Defendant that he had previously represented that he would be ready for sentencing on January 19, 2024. The court had then continued the hearing to February 23, 2024 "to give [Defendant] more time." However, Defendant was now raising new issues.

The trial court asked Defendant how long it would take to prepare the new trial motion. Defendant replied, "[H]onestly, your Honor, I am not sure." The court inquired, "Like a year?" Defendant responded, "I don't know how long the attorney will need, but I will tell him to speed it up."

The trial court then denied Defendant's request for a continuance. It explained that it had just received Defendant's continuance request that morning, and it had raised new issues. The court noted that when it "asked [Defendant] when we would be ready to do this, these motions here, and he didn't really have an answer for me at that time." Thus, the court concluded that "to continue the sentencing at this point . . . would interfere with the orderly administration of justice. Because . . . I have no idea when this would get going. And so we are going to do the sentencing today." The court also clarified that Defendant's *Franklin* proceeding would be done after sentencing. It then sentenced Defendant to a total term of 50 years to life in prison.

Defendant contends the trial court erred by denying his request to continue the sentencing hearing.

19

*B. Analysis*

"We review the trial court's denial of a continuance for abuse of discretion." (*People v. Seigler* (2025) 116 Cal.App.5th 596, 609.) "A reviewing court considers the circumstances of each case and the reasons presented for the request to determine whether a trial court's denial of a continuance was so arbitrary as to deny due process. [Citation.] Absent a showing of an abuse of discretion and prejudice, the trial court's denial does not warrant reversal." (*People v. Doolin* (2009) 45 Cal.4th 390, 450.)

Here, the trial court acted within its discretion. When it granted Defendant's motion to represent himself, it informed him that sentencing would occur on January 19, 2024. Defendant confirmed he would be ready. The court then continued the hearing to February 23, 2024, giving Defendant another month to prepare. Yet Defendant was not ready by that date. Further, he provided no convincing argument below as to why a continuance was needed. He did not explain how obtaining body camera footage or any other missing files would impact sentencing.[7] His mental health evaluation was purportedly needed for his *Franklin* proceeding, which could be done after sentencing. Similarly, Defendant did not show how any evidence concerning the Racial Justice Act would affect sentencing. Nor did he explain why he could not submit a Racial Justice Act claim after sentencing.

To the extent Defendant sought more time to file a new trial motion, he had already been allowed sufficient time to prepare one. He was convicted on October 18, 2023, and was not sentenced until February 23,

---

[7] Defendant did claim that the body camera footage would show one of the testifying officers committed perjury. But he did not explain how this impacted sentencing.

2024. Defendant was also unsure of the basis for his purported new trial motion, stating that "[i]t *might* cover the mental health stuff . . . ." (Italics added.) Nor could Defendant provide any estimate of how long it would take to prepare a new trial motion.

Given that Defendant had four months to file a new trial motion, he could not explain the basis for his proposed motion, and could not provide any estimate as to when it might be ready, the trial court did not abuse its discretion by denying his request to continue the sentencing hearing. (See *People v. Alexander* (2010) 49 Cal.4th 846, 933–935 [no abuse of discretion where court denied defense counsel's continuance motion because he had already been given five weeks to file a new trial motion and had previously represented that his caseload would not interfere with the motion's preparation].)

## DISPOSITION

The judgment is affirmed and remanded. On remand, we direct the trial court to schedule a *Franklin* proceeding at Defendant's request if it has not yet occurred.

MOORE, ACTING P. J.

WE CONCUR:

SANCHEZ, J.

DELANEY, J.

21